# **EXHIBIT A**

## **Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF**

**JUNE [__], 2009**

**BY AND AMONG**

**PARTICLE DRILLING TECHNOLOGIES, INC., A DELAWARE CORPORATION,**

**PARTICLE DRILLING TECHNOLOGIES, INC., A NEVADA CORPORATION**

**AND**

**PDTI HOLDINGS, LLC**

# TABLE OF CONTENTS

**DESCRIPTION**                                                                 **PAGE**

ARTICLE I DEFINITIONS ...........................................................................................1
    Section 1.1    Definitions ..............................................................................1
    Section 1.2    Construction............................................................................9

ARTICLE II PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES ...................10
    Section 2.1    Purchase of Assets and Assumption of Liabilities ........................10
    Section 2.2    Purchased and Excluded Assets.....................................................10
    Section 2.3    Assumed and Excluded Liabilities. ................................................12
    Section 2.4    Nonassignable Assets....................................................................14

ARTICLE III PURCHASE PRICE AND CLOSING ...................................................14
    Section 3.1    Closing .......................................................................................14
    Section 3.2    Purchase Price..........................................................................15
    Section 3.3    Allocation of Purchase Price ..........................................................15

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS.....................16
    Section 4.1    Organization and Qualification.......................................................16
    Section 4.2    Authority; Binding Obligation ........................................................16
    Section 4.3    Noncontravention; Consents..........................................................16
    Section 4.4    Regulatory Filings; Financial Statements; No Undisclosed
    Liabilities.    17
    Section 4.5    Accounts Receivable ....................................................................18
    Section 4.6    Products Liability.........................................................................18
    Section 4.7    Title to and Sufficiency of Purchased Assets. ..............................18
    Section 4.8    Real Property...............................................................................19
    Section 4.9    Permits .......................................................................................20
    Section 4.10    Intellectual Property. ...................................................................20
    Section 4.11    Legal Compliance ........................................................................21
    Section 4.12    Litigation....................................................................................22
    Section 4.13    Employees and Employee Benefits.................................................22
    Section 4.14    Environmental Matters .................................................................23
    Section 4.15    Insurance....................................................................................24
    Section 4.16    Contracts....................................................................................24
    Section 4.17    Suppliers ....................................................................................25
    Section 4.18    Taxes. ........................................................................................25
    Section 4.19    Banking Relationships ..................................................................25
    Section 4.20    Disclosure ..................................................................................25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER .........................26
    Section 5.1    Organization ...............................................................................26
    Section 5.2    Authorization; Binding Obligation .................................................26

i

*Section 5.3*    *Noncontravention; Consents* ..................................................................26
*Section 5.4*    *Litigation* ..............................................................................................26

ARTICLE VI COVENANTS ..............................................................................................27
*Section 6.1*    *General; Disclosure* ............................................................................27
*Section 6.2*    *Notices and Consents* ..........................................................................27
*Section 6.3*    *Conduct of the Business.* .....................................................................28
*Section 6.4*    *Transfer Taxes* ....................................................................................29
*Section 6.5*    *Prorations* ...........................................................................................30
*Section 6.6*    *Access to Business, Records and Documents* .....................................30
*Section 6.7*    *Bankruptcy Proceedings.* ....................................................................30
*Section 6.8*    *Alternative Transactions.* ....................................................................33
*Section 6.9*    *Publicity* ..............................................................................................33
*Section 6.10*   *Contacts with Suppliers, Customers and Other Parties* .....................34
*Section 6.11*   *Real Property Leases* ..........................................................................34
*Section 6.12*   *Confidentiality.* ...................................................................................34
*Section 6.13*   *Employment Contracts of Key Employees* ..........................................35

ARTICLE VII EMPLOYEE MATTERS ..............................................................................35
*Section 7.1*    *Employment.* ........................................................................................35
*Section 7.2*    *Employee Benefit Matters.* ..................................................................35

ARTICLE VIII CLOSING CONDITIONS ............................................................................36
*Section 8.1*    *Conditions to Obligations of the Buyer* ..............................................36
*Section 8.2*    *Conditions to Obligations of the Sellers* .............................................37

ARTICLE IX TERMINATION ...........................................................................................38
*Section 9.1*    *Termination of Agreement* ...................................................................38
*Section 9.2*    *Effect of Termination* ..........................................................................39
*Section 9.3*    *Break-Up Fee.* .....................................................................................39

ARTICLE X MISCELLANEOUS .......................................................................................39
*Section 10.1*   *Notices.* ...............................................................................................39
*Section 10.2*   *Expenses.* ............................................................................................40
*Section 10.3*   *Seller Disclosure Schedules* ...............................................................41
*Section 10.4*   *Bulk Sales or Transfer Laws* ...............................................................41
*Section 10.5*   *Assignment; Successors and Assigns* ...................................................41
*Section 10.6*   *Amendment; Waiver.* ...........................................................................41
*Section 10.7*   *Severability; Specific Performance.* ....................................................41
*Section 10.8*   *Counterparts* .......................................................................................42
*Section 10.9*   *Descriptive Headings* ..........................................................................42
*Section 10.10*  *No Third-Party Beneficiaries* ..............................................................42
*Section 10.11*  *Entire Agreement* ................................................................................42
*Section 10.12*  *Exhibits and Schedules* .......................................................................42
*Section 10.13*  *GOVERNING LAW* .............................................................................42
*Section 10.14*  *Jurisdiction* .........................................................................................42
*Section 10.15*  *WAIVER OF JURY TRIAL.* ..................................................................42

ii

**EXHIBITS:**

Exhibit A            Bill of Sale and Assignment and Assumption Agreement
Exhibit B            Assignment of Patents

**DISCLOSURE SCHEDULES:**

Schedule 1.1A            Required Consents
Schedule 2.2(a)(ii)      Assumed Contracts
Schedule 2.2(a)(iii)     Equipment
Schedule 2.2(a)(iv)      Purchased Intellectual Property
Schedule 2.2(a)(vi)      Leased Real Property
Schedule 2.2(b)(vi)      Other Excluded Assets
Schedule 3.2             Cure Amounts
Schedule 4.1             Organization and Qualification
Schedule 4.3(a)          Consents and Governmental Authorizations
Schedule 4.5             Accounts Receivable
Schedule 4.7(a)          Title to Purchased Assets
Schedule 4.7(b)          Sufficiency of Purchased Assets
Schedule 4.10(a)         Certain Intellectual Property
Schedule 4.13(b)         Employee Benefit Plans
Schedule 4.13(i)         Employment Terminations
Schedule 4.15            Insurance Policies
Schedule 4.16            Material Contracts
Schedule 4.17            Top 10 Suppliers
Schedule 4.19            Banking Relationships
Schedule 7.1             Employees

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated as of June [__], 2009 is entered into by and among Particle Drilling Technologies, Inc., a Delaware corporation ("PDT-DE"), Particle Drilling Technologies, Inc., a Nevada corporation ("PDT-NV" and together with PDT-DE, the "Sellers"), and PDTI Holdings, LLC, a Delaware limited liability company (the "Buyer").

WHEREAS, the Sellers are in the business of developing, marketing and selling products and services related to particle impact drilling technology (the "Business").

WHEREAS, PDT-NV and PDT-DE filed voluntary petitions for relief in a bankruptcy case (the "Bankruptcy Case") under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") on May 30, 2009 (the "Petition Date") and June 1, 2009, respectively.  The Sellers continue to operate their business and manage their property as a debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

WHEREAS, this Agreement contemplates a transaction in which, pursuant to Sections 363, 365 and 105 of the Bankruptcy Code, the Buyer will acquire substantially all of the assets of the Sellers and assume certain of the liabilities of the Sellers, all on the terms and subject to the conditions set forth in this Agreement and the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

*Section 1.1    Definitions.*  For purposes of this Agreement, the following terms have the meanings set forth below:

"Accounts Receivable" has the meaning set forth in **Section 2.2(a)(i)**.

"Affiliates" has the meaning set forth in Rule l2b-2 of the regulations promulgated under the Exchange Act.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in **Section 3.3**.

"Alternative Transaction" means the sale, transfer or other disposition of all or a material portion of the Purchased Assets to a third party other than the Buyer or any of its Affiliates in a single transaction or series of related transactions, whether pursuant to a stock or asset sale or distribution, share exchange, merger, plan of reorganization, plan of liquidation, recapitalization, business combination or other transaction involving the Sellers (or either of them).

"Ancillary Documents" means the Bill of Sale and Assignment and Assumption Agreement, the Assignment of Patents and each certificate and other document to be delivered pursuant to **Article VIII**.

"Apportioned Obligations" has the meaning set forth in **Section 6.5**.

"Approval Order" has the meaning set forth in **Section 6.7(d)**.

"Assets" means all assets, properties and rights of every kind and nature whatsoever (whether tangible or intangible), including real and personal property.

"Assignment of Patents" has the meaning set forth in **Section 8.1(e)**.

"Assumed Contracts" has the meaning set forth in **Section 2.2(a)(ii)**.

"Assumed Liabilities" has the meaning set forth in **Section 2.3(a)**.

"Auction" has the meaning set forth in **Section 6.7(c)**.

"Avoidance Actions" means all avoidance claims under the Bankruptcy Code, including all rights, claims, causes of actions and remedies arising under Bankruptcy Code Sections 329, 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bid Procedures Order" has the meaning set forth in **Section 6.7(c)**.

"Bill of Sale and Assignment and Assumption Agreement" has the meaning set forth in **Section 8.1(e)**.

"Books and Records" has the meaning set forth in **Section 2.2(a)(vii)**.

"Break-Up Fee" has the meaning set forth in **Section 9.3(a)**.

"Business" has the meaning set forth in the Recitals.

"Buyer" has the meaning set forth in the Preamble.

"Cash Purchase Price Component" has the meaning set forth in **Section 3.2(a)**.

"CERCLA" is defined in the definition of Environmental Laws in **Section 1.1** of this Agreement.

"Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

2

equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Closing" has the meaning set forth in **Section 3.1**.

"Closing Date" has the meaning set forth in **Section 3.1**.

"Closing Statement" has the meaning set forth in **Section 3.5**.

"COBRA" has the meaning set forth in **Section 7.2(b)**.

"Code" means the Internal Revenue Code of 1986, as amended (together with all rules and regulations promulgated thereunder).

"Confidential Information" has the meaning set forth in **Section 6.12**.

"Consent" means any approval, consent, ratification, permission, waiver or authorization from any Person other than a Governmental Entity.

"Contract" means any agreement, contract, obligation, promise, commitment or undertaking (whether written or oral and whether express or implied) that is or purports to be legally binding.

"Cure Amounts" means the cure, compensation and restatement costs and expenses of or relating to the assumption and assignment of the Contracts included in the Assumed Contracts and Permits related to the Business assumed and assigned to the Buyer hereunder pursuant to Section 365 of the Bankruptcy Code.

"DIP Financing Facility" means the Loan Agreement, dated as of [_____], among the Sellers and *[Edward F. Heil]*, as amended or otherwise modified from time to time.

"DIP Payment Amount" means, on the date of determination, the sum in the aggregate, of (i) the unpaid principal balance, plus (ii) all accrued and unpaid interest, fees, expenses and other amounts then outstanding under the DIP Financing Facility.

"Effective Time" has the meaning set forth in **Section 3.1**.

"Employee Benefit Plan" has the meaning set forth in **Section 4.13(b)**.

"Employee Welfare Benefit Plan" has the meaning set forth in **Section 4.13(b)**.

"Employees" has the meaning set forth in **Section 7.1(a)**.

"Environmental Laws" means any Law that pertains to environmental matters or contamination of any type whatsoever, including all Laws relating to any (i) manufacture, processing, use, distribution, treatment, storage, disposal, generation or transportation of Hazardous Materials; (ii) air, surface or ground water or noise pollution; (iii) Release; (iv)

3

protection of wildlife, endangered species, wetlands or natural resources; (v) health and safety of employees and other persons; and (vi) notification requirements relating to the foregoing, and including the following statutes and regulations adopted thereunder: (A) the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq. ("CERCLA"); (B) the Solid Waste Disposal Act, as amended by the Resource Conservation Recovery Act and the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 6901 et seq. ("RCRA"); (C) the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. § 1251 et seq.; (D) the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.; (E) the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq. ("TSCA"); (F) the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; (G) the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq. ("HMTA"); (H) the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; (I) the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; and (J) the Occupational Safety and Health Act, 19 U.S.C. § 6251 et seq.

"Equipment" has the meaning set forth in **Section 2.2(a)(iii)**.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, as amended

"Excluded Assets" has the meaning set forth in **Section 2.2(b)**.

"Excluded Liabilities" has the meaning set forth in **Section 2.3(b)**.

"Financial Statements" has the meaning set forth in **Section 4.4(b)**.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue; and provided further that, in the case of the Approval Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Buyer, in its sole and absolute discretion, elects to proceed with the Closing.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authorization" shall mean any permit, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization or approval issued,

granted, given or otherwise made available by or under the authority of any Governmental Entity or pursuant to any Law.

"Governmental Entity" means the United States, any state or other political subdivision thereof and any other foreign or domestic entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission, court, tribunal or instrumentality of the United States or any foreign entity, any state of the United States or any political subdivision of any of the foregoing.

"Hazardous Material" means each and every element, compound, chemical mixture, contaminant, pollutant, material or other substance that is defined, determined or identified as hazardous or toxic under any Environmental Law or the Release of which is prohibited under any Environmental Law, including (i) any "hazardous substance," "extremely hazardous substance" or "pollutant or contaminant" as those terms are defined in CERCLA; (ii) any "hazardous waste" as that term is defined in RCRA; (iii) any "hazardous material" as that term is defined in the HMTA; (iv) any "chemical substance or mixture" as that term is defined in TSCA; (v) petroleum and petroleum products and byproducts; (vi) asbestos; and (vii) radioactive or explosive materials.

"HMTA" is defined in the definition of Environmental Laws in **Section 1.1** of this Agreement.

"Improvements" has the meaning set forth in **Section 4.8(f)**.

"Income Tax Return" means, with respect to any Income Tax, any information return for such Income Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Income Tax, and any schedule or attachment thereto or amendment thereof.

"Income Taxes" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth or gross receipts taxes or similar governmental charge, including any estimated tax, interest, penalties or additions to tax or additional amounts in respect to the foregoing, including any transferee, successor or secondary liability for any such tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or similar group under state, local or foreign law, or being included or required to be included in any Income Tax Return relating thereto.

"Indebtedness" means, as to any Person, (a) all obligations of such Person for borrowed money (including obligations for reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured) or evidenced by a note, bond, debenture, draft or similar instrument, (b) all obligations of such Person to pay the deferred purchase price of property or services (but excluding accounts payable arising in the ordinary course of business), (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or

arising under any capital lease, conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property) and (e) any guaranty of, or any contingent obligation in respect of, any Indebtedness or other obligation of any other Person (other than an obligation of another Seller arising out of the conduct of the Business), but only to the extent of the obligation guaranteed.

"Initial Bankruptcy Motion" has the meaning set forth in **Section 6.7(a)**.

"Intellectual Property" means all (i) inventions (whether or not patentable and whether or not reduced to practice), patent disclosures, industrial designs, utility models and all patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisions, revisions, extensions, renewals and reexaminations thereof; (ii) Trademarks; (iii) copyrights, and all rights to databases and data, and all applications, registrations, and renewals therefor; (iv) trade secrets, know-how and confidential information, including research and development, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, financial reports and information, and business and marketing plans and proposals; (v) computer software (including source and executable code) and related documentation; (vi) rights, including rights of privacy and publicity, to use the names, likenesses and other personal characteristics of any individual; and (vii) any other intellectual property and proprietary rights.

"IRS" means the Internal Revenue Service.

"Knowledge" means, with respect to any Party, the knowledge, after reasonable investigation, of any officer, director, stockholder, member or manager of such Party, or of any employee of such Party with respect to any matter within the ordinary scope of such employee's responsibilities as an employee of such Party.

"Law" means any applicable federal, state, local or foreign law, statute, common law, rule, regulation, ordinance, permit, order, writ, injunction, judgment or decree of any Governmental Entity.

"Leased Real Property" has the meaning set forth in **Section 2.2(a)(vi)**.

"Liability" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required to be stated or disclosed in financial statements prepared in accordance with GAAP, or in the notes thereto.

"Licensed Intellectual Property" has the meaning set forth in **Section 4.10(b)**.

"Lien" means any lien, mortgage, pledge, encumbrance, security interest, equitable servitude, deed of trust, option, encroachment, reservation, order, decree, judgment, condition, restriction (including, in the case of Real Property, easements, rights of way, covenants, leases, licenses, zoning and setback requirements and other variances), charge, charge, claim, equity or

other third-party rights of any kind, including in the case of Intellectual Property, license rights or ownership interests of any other Person other than those arising pursuant to an Assumed Contract.

"Material Contracts" has the meaning set forth in **Section 4.16**.

"Net Working Capital Amount" means, as of the Effective Time, the difference between (i) the current assets constituting a portion of the Purchased Assets and (ii) the current liabilities assumed constituting a portion of the Assumed Liabilities.

"Nonassignable Asset" has the meaning set forth in **Section 2.4(a)**.

"Parties" means the Sellers and the Buyer together, and "Party" means the Sellers, on the one hand, or the Buyer, on the other hand, as the case may be.

"PBGC" has the meaning set forth in **Section 4.13(e)**.

"PDT-DE" has the meaning set forth in the Preamble.

"PDT-NV" has the meaning set forth in the Preamble.

"Permits" has the meaning set forth in **Section 2.2(a)(v)**.

"Permitted Liens" means (i) warehouse, mechanics' and materialmen's liens imposed by Law with respect to amounts not yet due and payable and (ii) liens for Taxes not yet due and payable; provided, however, in each case, that the foregoing does not materially affect the utility or value of the Assets or other matters or items to which they relate.

"Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Entity.

"Petition Date" has the meaning set forth in the Recitals.

"Post-Closing Period" has the meaning set forth in **Section 6.5**.

"Pre-Closing Period" has the meaning set forth in **Section 6.5**.

"Purchase Price" has the meaning set forth in **Section 3.2(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.2(a)**.

"Purchased Intellectual Property" has the meaning set forth in **Section 2.2(a)(iv)**.

"Qualified Bid" means a bid submitted by a Qualified Bidder pursuant to the Bid Procedures Order.

"Qualified Bidder" means a Person who (i) is prepared to sign this Agreement or another agreement more favorable to the Sellers than this Agreement and (ii) is reasonably deemed by the Sellers to have the financial capability to consummate the proposed transaction.

"RCRA" is defined in the definition of Environmental Laws in **Section 1.1** of this Agreement.

"Real Property" means, collectively, all real property interests of any kind, including (a) land, (b) buildings, structures and improvements, (c) fixtures, equipment and machinery attached to any of the foregoing, (d) parking rights and spaces, (e) oil, gas and mineral rights and (f) easements, rights of way, reservations, privileges and other appurtenances.

"Real Property Leases" has the meaning set forth in **Section 4.8(b)**.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, depositing, dispersing, migration, burying, abandoning or disposing into the environment of any Hazardous Materials that is prohibited under any applicable Environmental Law.

"Regulatory Filings" has the meaning set forth in **Section 4.4(a)**.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Required Consents" means the consents, approvals, authorizations, permissions, filings and notifications set forth on Schedule 1.1A.

"Schedule" means a schedule to this Agreement, including each of the Seller Disclosure Schedules, that is incorporated herein pursuant to **Section 10.12**.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Selected Courts" has the meaning set forth in **Section 10.14**.

"Seller Disclosure Schedules" means, collectively, all of the Schedules in respect of **Article IV** of this Agreement.

"Sellers" has the meaning set forth in the Preamble.

"Sellers' Employee Benefit Plan" has the meaning set forth in **Section 4.13(b)**.

"Senior Secured PIK Notes" means those certain 10% Senior Secured PIK Note due 2010 pursuant to that certain purchase agreement dated as of February 11, 2009 among PDT-NV, PDT-DE,  LC Capital Master Fund, Ltd., a Cayman Islands exempted company, Don A. Sanders and Edward F. Hiel.

"Target Net Working Capital Amount" has the meaning set forth in **Section 3.2(c)**.

"Tax" or "Taxes" means a tax or taxes of any kind or nature, or however denominated, including liability for federal, state, provincial, local, foreign or other sales, use, transfer, registration, business and occupation, value added, excise, severance, stamp, premium, windfall profit, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax or similar governmental charge, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect to the foregoing, including any transferee, successor or secondary liability for a tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or similar group under state, local or foreign law, or being included or required to be included in any Tax Return relating thereto; provided, however, that "Tax" or "Taxes" will not include any Income Taxes.

"Tax Returns" means, with respect to any Tax, any information return for such Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Tax, any schedule or attachment thereto or amendment thereof.

"Trademarks" means, as they exist anywhere in the world, trademarks, service marks, trade dress, trade names, brand names, designs, logos, or corporate names, whether registered or unregistered, and all registrations and applications for registration thereof, and all goodwill related thereto.

"Trade Payables" has the meaning set forth in **Section 2.3(a)(v)**.

"Transfer Taxes" has the meaning set forth in **Section 6.4**.

"Transferred Employees" has the meaning set forth in **Section 7.1(a)**.

"Treasury Regulation" means the final or temporary regulations promulgated under the Code, in effect from time to time.

"TSCA" is defined in the definition of Environmental Laws in **Section 1.1** of this Agreement.

Section 1.2     Construction.

(a)     For purposes of this Agreement, whenever the context requires, the singular number will include the plural, and vice versa, the masculine gender will include the feminine and neuter genders, the feminine gender will include the masculine and neuter genders, and the neuter gender will include masculine and feminine genders.

(b)     As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."

(c)     Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections and Exhibits to this Agreement.

9

(d)     As used in this Agreement, the terms "hereof," "hereunder," "herein" and words of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)     Each Party hereto has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties.  Consequently, this Agreement will be interpreted without reference to any rule or precept of Law to the effect that any ambiguity in a document be construed against the drafter.

**ARTICLE II**
**PURCHASE OF ASSETS**
**AND ASSUMPTION OF LIABILITIES**

*Section 2.1     Purchase of Assets and Assumption of Liabilities*.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer will purchase from the Sellers, and the Sellers will sell, assign, convey and deliver to the Buyer, free and clear of any Liens other than Permitted Liens, all right title and interest in and to the Purchased Assets, and the Buyer agrees to assume the Assumed Liabilities.

*Section 2.2     Purchased and Excluded Assets*.

(a)     The "Purchased Assets" shall include all of the Assets that are owned, leased, licensed used or held for use by Sellers (or any of them) in connection with the Business or otherwise owned by Sellers (other than Excluded Assets), in each case wherever located, including the following:

(i)     all accounts and notes receivable and unbilled revenues, however arising, including from the sale or shipment of goods or materials or the rendering of services by or on behalf of any Seller in connection with the Business, including all rights, claims and remedies relating thereto and any related deposits, security and collateral therefor (the "Accounts Receivable"), in each case, as in existence on the Closing Date;

(ii)     subject to **Section 6.7(e)**, each of the Contracts set forth on Schedule 2.2(a)(ii) (collectively, the "Assumed Contracts");

(iii)     all machinery, equipment, equipment subassemblies, tools, dies, drills, jigs, molds, prototypes, spare and replacement parts, packaging materials, storage and shipping materials, computer hardware, including desktops, peripherals and servers, tangible embodiments of Sellers' Intellectual Property, furniture, furnishings, office equipment and supplies, telephone and communications equipment and any other fixed assets or tangible personal property used or held for use in connection with the Business, including in each case those items listed on Schedule 2.2(a)(iii) or acquired after the date hereof  (the "Equipment");

(iv)     all Intellectual Property used or held for use in connection with the Business, including those items listed on Schedule 2.2(a)(iv) *[Note: Schedule to list all patents]* or acquired after the date hereof, and including all Trademarks that include, are derived from, are used with or are likely to be confused with the names and marks

10

"Particle Drilling," "Particle Drilling Technologies," and *[_____]* together with all rights associated with the foregoing, including the right to sue and collect for past infringement, misappropriation or other unauthorized use thereof (collectively, "<u>Purchased Intellectual Property</u>");

(v)    all Governmental Authorizations which are used or held for use in connection with the ownership, conduct or operation of the Business by the Sellers (the "<u>Permits</u>");

(vi)    the leasehold interests of the Sellers, as lessees, in the Real Property identified as leased on <u>Schedule 2.2(a)(vi)</u> (the "<u>Leased Real Property</u>");

(vii)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) of the Sellers, including Tax books and records and Tax Returns of the Sellers used or held for use in connection with the ownership, operation or conduct of the Business or the Purchased Assets, including Assumed Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers and other data (the "<u>Books and Records</u>"); <u>provided</u>, that the Sellers may retain copies of the foregoing for administrative purposes;

(viii)    all insurance proceeds or right to insurance proceeds under any insurance policies of Sellers with respect to any of the Purchased Assets or Assumed Liabilities;

(ix)    all rights under or pursuant to any warranties, representations and guarantees made by suppliers, manufacturers, contractors or other Persons in connection with any products or services provided to any Seller in connection with the Business or with respect to any Purchased Asset;

(x)    all Claims of the Sellers against third parties arising out of or relating to the Purchased Assets, Assumed Liabilities or the Business, other than any Avoidance Actions;

(xi)    all Claims against the Sellers' officers, directors, employees and agents, other than any Avoidance Actions to the extent not otherwise released by the Bankruptcy Court;

(xii)    other than the stock of PDT-DE held by PDT-NV, all equity interests (if any) in other entities and joint ventures owned by the Sellers;

(xiii)    all goodwill associated or arising in connection with any of the Purchased Assets or the Business;

(xiv)    all credits, prepaid expenses, deferred charges, advance payments, security deposits, and prepaid items (excluding in respect of Taxes and Income Taxes), in each case relating to the Purchased Assets or the Assumed Liabilities; and

(xv)    subject to **Section 6.5**, any rights to credits, refunds, rebates or abatements of any Taxes with respect to the Purchased Assets relating to periods (or portions thereof) ending after the Closing Date.

(b)    Notwithstanding the foregoing, Sellers will retain all right, title and interest in and to, and the Purchased Assets will not consist of, the following assets, rights or properties of Sellers (the "Excluded Assets"):

(i)    any cash or cash equivalents, including any marketable securities or certificates of deposit, or any collected funds or items in the process of collection at the Sellers' financial institutions (but such items in process shall only be excluded if already applied to reduce the amount of accounts receivables relating thereto) at the time of Closing;

(ii)    the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates, books and records relating to Income Taxes, and any other documents relating to the organization, maintenance and existence of the Sellers as corporations, except, in each case, to the extent copies of the foregoing are necessary or desirable in connection with the use of the Purchased Assets;

(iii)    any Avoidance Actions of the Sellers or an Affiliate of the Sellers, including all proceeds thereof;

(iv)    except as otherwise specifically provided in this Agreement, any Sellers' Employee Benefit Plans and corresponding assets or any rights of a Seller or any of its Affiliates in the Sellers' Employee Benefit Plans provided by a Seller to the Employees;

(v)    any Contract (including any post-petition Contracts) to which the Sellers are a party or are otherwise subject that is not an Assumed Contract; and

(vi)    any of the assets set forth in Schedule 2.2(b)(vi), as such Schedule may be amended, modified or supplemented by Buyer at any time, and from time-to-time, prior to the Closing.

*Section 2.3    Assumed and Excluded Liabilities*.

(a)    The "Assumed Liabilities" shall consist of only the following liabilities of the Sellers as the same exist as of the Closing:

(i)    Liabilities arising under the Assumed Contracts, including all Cure Amounts in connection therewith; and

(ii)    Liabilities in respect of salaries, wages, sales commissions and other employment compensation (and related withholdings and payroll Taxes) to the extent accrued after the Closing Date.

(b)     The Buyer will not assume or become responsible for, and will not be deemed to have assumed or to have become responsible for any liabilities and obligations other than the Assumed Liabilities, including the following liabilities and obligations of the Sellers (collectively the "Excluded Liabilities"):

(i)     any and all Liabilities arising out of or relating to (A) any Environmental Laws or the violation thereof; (B) any generation, use, handling, treatment, storage, transportation, disposal or Release of any Hazardous Materials at or adjacent to any of the Leased Real Property or by any Seller or any Representative of any Seller in connection with the Purchased Assets or the Business; or (C) any condition in, at, on, under or emanating from any premises owned, leased or operated by any Seller in connection with the Purchased Assets or the Business on or prior to the Closing Date;

(ii)     any and all Liabilities of the Sellers arising under any Contracts other than any Liabilities identified as Assumed Liabilities under **Section 2.3(a)**;

(iii)     any and all Liabilities of the Sellers not identified as Assumed Liabilities in **Section 2.3(a)**;

(iv)     any and all Liabilities of the Sellers related to any employee benefit plan, program, policy or agreement, whether or not such liability or obligation arises prior to, on or after the Closing Date;

(v)     any and all other Liability of the Sellers relating to the employment or termination of employment of any (x) individual arising from or related to the operation of the business of the Sellers at or prior to the Closing of the transactions contemplated by this Agreement (including any severance policy, plan, agreement or program which exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement), or (y) individual who is not a Transferred Employee arising on or after the Closing Date;

(vi)     any and all Liabilities of the Sellers, whether or not such Liabilities arise prior to or on or after the Closing Date, related to (A) any "employee pension benefit plan" (as defined in Section 3(2) of ERISA) whether or not subject to Title IV of ERISA or Section 312 of the Code; (B) any "multiemployer plan" as defined in Section 3(37) of ERISA; (C) any obligation to provide or make available post-retirement welfare benefits or welfare benefit coverage to any employee or former employee of the Sellers; or (D) any pre-petition long-term disability claims; and

(vii)     any and all Liabilities for any claims for injuries or other compensable events or occupational illnesses or diseases of any Transferred Employee attributable to events occurring on or before the Closing Date; and

(viii)     any and all Liabilities relating to (A) Income Taxes of the Sellers (including Income Taxes payable by reason of the transactions contemplated by this Agreement); (B) Taxes of the Sellers with respect to Excluded Assets; (C) all Taxes and Transfer Taxes with respect to the Purchased Assets for periods (or portions thereof)

ending on or before the Closing Date; and (D) any Tax or Income Tax allocation or sharing agreement to which any of the Sellers is a party.

*Section 2.4      Nonassignable Assets.*

(a)      Notwithstanding anything to the contrary, nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Permit or Assumed Contract) to the Buyer which by its terms or by Law is not assignable or transferable without the consent of a third party or a Governmental Entity or is cancelable by a third party in the event of an assignment or transfer (a "Nonassignable Asset"), unless and until such consent shall have been obtained or unless such consent is not required by virtue of the Bankruptcy Code.

(b)      The Sellers shall use commercially reasonable efforts to obtain as expeditiously as possible any consent that may be required for the assignment or transfer of a Nonassignable Asset to the Buyer; provided, however, that neither the Sellers nor the Buyer shall be required to make any payment to obtain any such consent with respect to any Nonassignable Asset.

(c)      Unless and until any consent that may be required is obtained, to the extent permitted by applicable Law and by the terms of the applicable Nonassignable Asset, the Sellers and the Buyer will cooperate and use commercially reasonable efforts to establish an arrangement reasonably satisfactory to the Buyer and the Sellers (i) under which the Buyer would obtain the Claims, rights, and benefits, and be responsible for performing and discharging when due the Liabilities and obligations, of the Sellers under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or (ii) under which the Sellers would enforce for the benefit of the Buyer, and the Buyer would assume and agree to pay the Sellers' Liabilities and obligations relating to such enforcement, any and all Claims, rights and benefits of the Sellers against a third party thereto.

(d)      The Sellers shall promptly pay over to the Buyer the net amount (after costs and actual net Tax and Income Tax costs with respect to receipt of such payments) of all payments received by it from third parties in respect of all Nonassignable Assets, and the Buyer shall promptly pay, perform, or discharge, when due, any and all obligations and Liabilities arising thereunder.

**ARTICLE III**
**PURCHASE PRICE AND CLOSING**

*Section 3.1      Closing*.  The closing of the transactions contemplated by this Agreement (the "Closing") will occur as promptly as practicable, but in no event more than three business days, following the satisfaction and/or waiver of all conditions to Closing set forth in **Article VIII** (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), at the offices of *[_____]*, *[_____]*, or at such other place on such other date as the Parties may agree in writing.  The date on which the Closing actually occurs will be referred to as the "Closing Date," and the Closing will be deemed effective as of 8:00 a.m., Central time, on the Closing Date (the "Effective Time").

14

Section 3.2      *Purchase Price*.

(a)      The purchase price (the "<u>Purchase Price</u>") shall be equal to the sum of (i) a Bankruptcy Code 363(k) credit bid in an amount equal to the sum of the DIP Payment Amount, (ii) $200,000 (the "<u>Cash Purchase Price Component</u>") and (iii) the Assumed Liabilities; <u>provided</u>, <u>however</u>, that the Cash Purchase Price Component shall be adjusted downward in an amount equal to $.67 for every dollar of any Accounts Receivable collected by the Sellers from and after the Petition Date and prior to the Closing.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer will pay and deliver to Sellers the Cash Purchase Price Component by wire transfer of immediately available funds to an account or accounts designated by the Sellers.

(b)      At Closing, the Buyer shall pay the Cure Amounts (i) in the amounts set forth in the <u>Schedule 3.2</u> to be delivered by the Sellers to the Buyer in connection with the assumption of the Assumed Contracts or (ii) in the amounts negotiated by the Buyer and the third parties (other than Sellers or their Affiliates) to such Assumed Contracts; <u>provided</u>, that in the circumstances described in item (ii) of this **Section 3.2(b)**, the Sellers shall receive a release from such third parties with respect to the difference between the Cure Amounts and the negotiated amount.

Section 3.3      *Allocation of Purchase Price*.  The Sellers and the Buyer will attempt in good faith to agree upon the allocation of the Purchase Price, and all other relevant assumed liabilities and costs among the Purchased Assets (the "<u>Allocation</u>") prior to the Closing Date, solely for Income Tax purposes in accordance with the provisions of Section 1060 of the Code and any other applicable provisions of law.  If such an agreement is reached, the Sellers and the Buyer will file all required Tax Returns and Income Tax Returns consistent with such Allocation, and not take any inconsistent position for any Income Tax or Tax purpose, unless otherwise required to do so by a change of law or good faith resolution of a contest.  If such an agreement is not reached, then the Sellers and the Buyer will adopt the Buyer's reasonably proposed allocation.  Notwithstanding the foregoing, the Allocation for Income Tax purposes shall not be binding on any party in interest for purposes of determining distributions in connection with the litigation of the Sellers' bankruptcy estates.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the Schedules of the Seller Disclosure Schedules corresponding to the respective Sections of this **Article IV**, the Sellers, jointly and severally, represent and warrant to the Buyer as of the date hereof and as of the Closing Date as follows:

Section 4.1    *Organization and Qualification*.  Except as set forth on <u>Schedule 4.1</u>, each Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  The Sellers have full and unrestricted corporate power and authority to own, possess, use and/or lease the Purchased Assets and to carry on the Business as currently conducted.  The Sellers are duly qualified or registered to do business as a foreign entity, and are in good standing, in the states, countries and territories in which the ownership, possession or use of the Purchased Assets or the conduct of the Business requires such qualification or registration. The Regulatory Filings include true, correct and complete copies of the articles of incorporation, by-laws and other organizational and governance documents of the Sellers as currently in effect. Except as set forth on <u>Schedule 4.1</u>, the Sellers do not, directly or indirectly, own or have any interest in any of the capital stock or other equity securities of any other Person.

Section 4.2    *Authority; Binding Obligation*.  Each Seller has the full and unrestricted corporate power and authority to execute and deliver this Agreement and each other Ancillary Document to which it is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Seller of this Agreement and each other Ancillary Document to which such Seller is a party, the performance of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action, and no other corporate action or proceeding is necessary to authorize the execution and delivery of this Agreement and each other Ancillary Document to which such Seller is a party, the performance of its obligations hereunder and thereunder or the consummation of the transactions contemplated hereby and thereby.  This Agreement has been duly executed by each Seller and constitutes, and each other Ancillary Document to be executed by either Seller, when executed and delivered in connection herewith, will constitute, a legal, valid and binding obligation of such Seller, enforceable in accordance with its terms.

Section 4.3    *Noncontravention; Consents*.

(a)    The execution and delivery by each Seller of this Agreement and each of the other Ancillary Documents to which such Seller is a party, the performance of and compliance with the respective terms and provisions hereof and thereof, and the consummation by Sellers of the transactions contemplated hereby and thereby, do not and will not require any Consent or Governmental Authorization from, or filing with or notification to, any Person (other than the Bankruptcy Court) not a party to this Agreement, except as set forth on <u>Schedule 4.3(a)</u>.

(b)    The execution and delivery by each Seller of this Agreement and each of the other Ancillary Documents to which such Seller is a party, the performance of and compliance with the respective terms and provisions hereof and thereof and the consummation by the Sellers of the transactions contemplated hereby and thereby do not and will not (i) conflict with, or violate any

16

provision of, the articles of incorporation, bylaws or any other organizational or governance documents of any Seller; (ii) subject to obtaining the Governmental Authorizations set forth on Schedule 4.3(a), conflict with or violate any Law; (iii) subject to obtaining the Consents set forth on Schedule 4.3(a), conflict with, result in any breach of, or constitute a default (with or without notice or lapse of time or both) or give rise to any obligation, right of termination, cancellation or acceleration, increase any Liability or result in the loss of any right or benefit, or create in another Person a put right, purchase obligation or similar right, under any Contract to which Seller is a party; (iv) result in or require the creation or imposition of any Lien of any nature upon, or result in the creation or acceleration of any Indebtedness with respect to, the Business or any of the Purchased Assets; or (v) result in or give rise to any penalty, forfeiture or restriction on the Business.

(c)     No Governmental Entity or any other Person has notified any Seller that such Governmental Entity or other Person intends to object to the transactions contemplated hereunder or under any other Ancillary Document.  To the Sellers' Knowledge, there is no fact or circumstance relating to the Business or the Purchased Assets that could reasonably be expected to (i) cause the filing of any objection to any application for any Governmental Authorization required in connection with the transactions contemplated hereby; (ii) lead to any delay in processing any such application; or (iii) require any waiver of any rule, policy or other applicable Law of any Governmental Entity.

Section 4.4     Regulatory Filings; Financial Statements; No Undisclosed Liabilities.

(a)     Since January 1, 2007, PDT-NV has filed on a timely basis with the SEC all forms, statements, reports, certifications, schedules and other documents (including all exhibits and amendments thereto) required to be filed or furnished by it under the Exchange Act or the Securities Act (collectively, together with the information incorporated by reference therein, the "Regulatory Filings").  Each of the Regulatory Filings, including each of the Regulatory Filings filed or furnished after the date hereof, as of the date filed or furnished (or if amended prior to the date of this Agreement, then as of the date of the last such amendment) (A) complied in all material respects as to form with the applicable requirements under the Securities Act or the Exchange Act, as the case may be, and (B) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)     Each of the consolidated financial statements contained in or incorporated by reference into any such Regulatory Filing (including the related notes and schedules) (collectively, the "Financial Statements") (i) complied in all material respects as to form with the published rules and regulations of the SEC with respect thereto, (ii) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, and (iii) fairly presented in all material respects the financial position of the Sellers on a consolidated basis as of the date of such statement and the consolidated results of the Sellers' operations and cash flows for the periods indicated in such statement, except in each case subject to normal year end audit adjustments and as permitted by SEC Form 10-Q promulgated under the Exchange Act in the case of unaudited statements.  The Sellers have not had any material dispute with any of its auditors regarding accounting matters or policies during any of its past two (2) full fiscal years or

during the current fiscal year that is currently outstanding or that resulted in an adjustment to, or any restatement of, the Financial Statements.

(c)     Except for Liabilities (A) incurred in the ordinary course of business since September 30, 2008, (B) that have been discharged or paid in full in the ordinary course of business since September 30, 2008, (C) reflected in or reserved against on the most recent balance sheet of the Sellers prepared in accordance with GAAP and included in the Regulatory Filings filed with the SEC prior to the date of this Agreement or (D) that arise under this Agreement, the Sellers do not have any Liabilities that would be Assumed Liabilities.

Section 4.5    *Accounts Receivable*.  Except as set forth on Schedule 4.5, Accounts Receivable owing to the Sellers and included in the Purchased Assets (i) represent bona fide arm's length sales in the ordinary course of business consistent with past practice and the services or goods involved have been performed or delivered to the respective clients and/or the account obligors, and no further material services or goods are required to be rendered or delivered in order to entitle the Sellers or, after the Closing, the Buyer, to collect such respective Accounts Receivable in full (subject to any reserves reflected in the Financial Statements), and (ii) constitute valid claims of the Sellers, free and clear of all Liens, other than Permitted Liens.

Section 4.6    *Products Liability*.  In connection with the conduct of the Business:  (i) to the Sellers' Knowledge, there are no developments, events, conditions, circumstances, activities, practices, incidents, actions, omissions or plans that have given rise to or could reasonably be expected to give rise to any material Liability based on or related to any alleged defective product that is or was designed, forged, manufactured, serviced, marketed, distributed or sold by or on behalf of the Sellers, or any service provided or allegedly provided by or on behalf of the Sellers; (ii) all products (including the functionality, operation, performance, packaging and advertising related thereto) designed, forged, manufactured, marketed, distributed, sold or otherwise placed in the stream of commerce by or on behalf of the Sellers, and all services provided by or on behalf of the Sellers, comply with and have complied in all material respects with all applicable Governmental Authorizations and Laws and all applicable specifications and industry and customer standards; and (iii) there have not been, and there are no, material defects or deficiencies in any such products or services.  Neither Seller has made or provided any warranty (whether written or oral) that is currently in effect with respect to the quality of, or absence of defects in, any of the products or services it has designed, forged, manufactured, marketed, distributed or sold.

Section 4.7    *Title to and Sufficiency of Purchased Assets*.

(a)     Except as set forth on Schedule 4.7(a), the Sellers have good and marketable title to, or have other legal rights to possess or use and deliver, all of the material tangible personal property included in the Purchased Assets, free and clear of all Liens, except for Permitted Liens.

(b)     Except as set forth on Schedule 4.7(b), the Purchased Assets include all real property and related rights and interests and all tangible personal property of the Sellers that are necessary to conduct the Business immediately following the Closing in substantially the same manner as conducted by the Sellers prior thereto consistent with past practice.  The Equipment is

in working order for its respective ages and, subject to continued repair and replacement consistent with past practice, is suitable for its intended use.

(c)      No material portion of the Purchased Assets has suffered any material casualty or physical damage since the date of this Agreement.

*Section 4.8      Real Property.*

(a)      Neither Seller (i) holds fee title in or to any Real Property or (ii) owns or holds, or is obligated under or a party to, any option, right of first refusal or other contractual right to purchase, acquire, sell or dispose of any Real Property.

(b)      Schedule 2.2(a)(vi) sets forth a correct and complete list of all of the Leased Real Property and all of the leases, subleases, licenses and other agreements under which any Seller uses or occupies or has the right to use or occupy any of the Leased Real Property (collectively, the "Real Property Leases"), including the date of and parties to each Real Property Lease and each amendment, modification and supplement thereto, the term and renewal terms (whether or not exercised) thereof and a brief description of the Leased Real Property covered thereby.  All of the Real Property used or occupied by any Seller, or used in the conduct of the Business, is included in the Leased Real Property.  The Sellers have made available to Buyer true and complete copies of all Real Property Leases (including all modifications, amendments and supplements thereto).  Subject to the Bankruptcy Case, each Real Property Lease is valid, binding and in full force and effect.  All rent and other sums and charges payable by the applicable Seller as tenant under each Real Property Lease are current, subject to the Bankruptcy Case.  The applicable Seller holds peaceful, undisturbed leasehold title, estate and interest in each Real Property Lease free and clear of all Liens, except for Permitted Liens.  No Seller has received written notice or otherwise has knowledge that any party to any Real Property Lease intends to cancel, terminate, or refuse to renew such Real Property Lease or to exercise or decline to exercise any option or right thereunder, except to the extent any such notice would be ineffective and unenforceable as a result of the Bankruptcy Case.  Additionally, with respect to each Real Property Lease, except to the extent excused by or unenforceable as a result of the commencement or pendency of the Bankruptcy Case or the application of any provision of the Bankruptcy Code (but only to the extent such excuse, lack of enforceability or application of law will continue to apply in favor of Buyer and its successors and assigns following the Closing), no party to any Real Property Lease is in breach or default, and no event has occurred which, with notice or lapse of time, would permit termination, modification or acceleration thereunder.

(c)      Except for any Permitted Liens, and except as disclosed in any Real Property Lease, (i) no Person other than a Seller has any right to the possession, use, occupancy or enjoyment of any portion of the Leased Real Property, and (ii) there are no leases, subleases, licenses and other agreements granting to any person other than a Seller any right to the possession, use, occupancy or enjoyment of the Leased Real Property or any portion thereof.

(d)      There are no pending, or to the Sellers' Knowledge, threatened or contemplated condemnation or eminent domain proceeding affecting the Leased Real Property or any part thereof, or any sale or other disposition of the Leased Real Property or any part thereof in lieu of condemnation or eminent domain by any Governmental Entity.

(e)     No portion of the Leased Real Property has suffered any material damage by fire or other casualty which has not heretofore been completely repaired and restored to its original condition or better.  No portion of the Leased Real Property is located in a special flood hazard area as designated by Federal Governmental Entities.

(f)     All components of all buildings, structures and other improvements included within the Leased Real Property (collectively, the "Improvements"), including the roofs and structural elements thereof and the heating, ventilation, air conditioning, plumbing, electrical, mechanical, sewer, waste water, storm water, paving and parking equipment, systems and facilities included therein, are in good working order and repair (ordinary wear and tear excepted).  All water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems serving the Leased Real Property are installed and operating and are sufficient to enable the Leased Real Property to continue to be used and operated in the manner currently being used and operated.  Each such utility or other service is provided by a public or private utility or service company and enters the Leased Real Property from an adjacent public street or valid private easement owned by the supplier of such utility or other service.  Each Improvement has direct access to a public street adjoining the Leased Real Property on which such Improvement is situated, over driveways or accessways currently being used in connection with the use and operation of such Improvement.  No Improvement or portion thereof is dependent for its access, operation or utility on any Real Property not included in the Leased Real Property.  To the Sellers' Knowledge, no Improvement encroaches upon any property not included within the Leased Real Property or upon the area of any easement affecting the Leased Real Property.  To the Sellers' Knowledge, there are no encroachments or other facts or conditions affecting any parcel of Leased Real Property that would, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation thereof as currently used, occupied or operated or as intended to be used, occupied or operated.

Section 4.9     Permits.  The Sellers have obtained or applied for, and are in material compliance with, all Permits that are required by any Governmental Entity to conduct in all material respects the Business as presently conducted, and use and occupy the Leased Real Property as currently used and occupied.  All material Permits required to conduct the Business as currently conducted consistent with past practice are valid and in full force and effect, and there exists no material default thereunder.

Section 4.10     Intellectual Property.

(a)     Schedule 4.10(a) sets forth a complete and accurate list of all of the following Purchased Intellectual Property:  (i) all patents, patent applications, material patent disclosures and material unpatented inventions; (ii) all Trademarks, Trademark registrations and applications, and material unregistered Trademarks; (iii) all copyright registrations and applications, and material unregistered copyrights; (iv) all computer software (including source and executable code) and related documentation; and (v)  all other material Intellectual Property.

(b)     The Sellers own all right, title and interest in and to all of the Purchased Intellectual Property, including the Intellectual Property set forth on Schedule 4.10(a), free and clear of all Liens, except for Permitted Liens.  The Purchased Intellectual Property, together with

20

any Intellectual Property licensed to the Sellers pursuant to an Assumed Contract (the "Licensed Intellectual Property"), includes all of the Intellectual Property necessary to conduct the Business as conducted as of the date hereof, as of the Closing Date and as presently contemplated to be conducted.  Immediately subsequent to the Closing, the Purchased Intellectual Property will be owned and available for use by, and the Licensed Intellectual Property will be licensed to and available for use by, the Buyer in the same manner in which the Sellers owned and used the Purchased Intellectual Property and licensed and used the Licensed Intellectual Property immediately prior to the Closing, without the imposition of any additional obligations, restrictions or limitations.  During the three (3) year period prior to the date hereof, none of the Sellers nor any of their Affiliates have assigned to any Person any Intellectual Property related to the Business.

(c)      The operation of the Business as currently conducted does not, and the continued operation by the Buyer of the Business as currently conducted will not, infringe, misappropriate or otherwise make any unlawful or unauthorized use of any Intellectual Property of any Person. The products and services sold or performed by the Sellers in connection with the Business do not, and the manufacture, use, sale or performance of such products or services does not, infringe, misappropriate or otherwise make any unlawful or unauthorized use of any Intellectual Property of any Person.  None of the Sellers has received any notice or other communication claiming, alleging or suggesting that any Seller has infringed, misappropriated or otherwise made any unlawful or unauthorized use of any Intellectual Property and, to the Sellers' Knowledge, no other Person has threatened to make any such claims.   None of the Sellers has received any unsolicited offers to license Intellectual Property from any other Person.  To the Sellers' Knowledge, no other Person is infringing, misappropriating or otherwise making any unlawful or unauthorized use of any Purchased Intellectual Property or any Licensed Intellectual Property for which any Seller has the right to enforce.

(d)      The Sellers have taken all reasonable and desirable steps to maintain and protect all of the Purchased Intellectual Property so as not to adversely affect the validity or enforceability thereof, and no loss or expiration of any of the Purchased Intellectual Property is threatened, pending or reasonably foreseeable, except for Intellectual Property expiring at the end of its statutory term (and not as a result of any act or omission by the Sellers, including a failure to pay any required maintenance fees).  No Seller has disclosed any Purchased Intellectual Property of a confidential nature (including trade secrets) to any Person.  Without limiting the foregoing, the Sellers have, and enforce, a policy requiring each employee, consultant and contractor to execute a written agreement protecting the confidentiality of any Purchased Intellectual Property of a confidential nature and requiring such Person to assign all Intellectual Property related to the Business to the Sellers (the forms of which have been provided to Buyer), and all current and former employees, consultants and contractors of the Sellers have executed such an agreement.  All Purchased Intellectual Property is valid, enforceable and subsisting.

*Section 4.11   Legal Compliance*.  Since September 30, 2007, the Sellers have complied with, and as of the date hereof and the Closing Date, each is in compliance with, all applicable Laws.

Section 4.12   *Litigation*.  There are no legal, administrative, arbitration or other formal proceedings or governmental investigations pending or, to the Sellers' Knowledge, threatened, (and to the Sellers' Knowledge any circumstances that may give rise thereto) (i) against the Sellers with respect to the Purchased Assets, the Assumed Liabilities or the conduct of the Business or (ii) that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Sellers in connection with this Agreement or any of the Ancillary Documents.   There are no outstanding orders, injunctions or decrees of any Governmental Entity that apply to the Purchased Assets that restrict the ownership, disposition or use of the Purchased Assets or the conduct of the Business.

Section 4.13   *Employees and Employee Benefits*.

(a)      There are no collective bargaining, memoranda of understanding, settlements or other labor agreements with any union or labor organization that apply to the Business.  As of the date hereof: (i) there are no strikes, work stoppages, boycotts, other material concerted actions or material labor disputes pending, or to the Sellers' Knowledge, threatened, with respect to the Employees, and (ii) to the Sellers' Knowledge, no union organization campaign is in progress with respect to the Employees, and no question concerning representation exists respecting the Employees.

(b)      For purposes of this Agreement, the term "Employee Benefit Plan" means an employee pension benefit plan within the meaning of Section 3(2) of ERISA or an employee welfare benefit plan within the meaning of Section 3(1) of ERISA (an "Employee Welfare Benefit Plan"), where no distinction is required by the context in which the term is used. Schedule 4.13(b) lists each Employee Benefit Plan, fringe benefit plan and other incentive compensation or bonus programs, policies and arrangements, whether or not subject to ERISA, that the Sellers or any of their Affiliates maintain with respect to the current or former employees of the Business or to which the Sellers or any of their Affiliates contributes with respect to the current or former employees of the Business (each a "Sellers' Employee Benefit Plan").

(c)      (i) each Seller Benefit Plan has been established and administered in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable laws; (ii) no individual who has performed services for the Sellers has been improperly excluded from participation in any Seller Benefit Plan (disregarding Persons later included with retroactive adjustments to correct the improper exclusion) and (iii) each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that such Seller Benefit Plan is qualified under the Code and nothing has occurred that could reasonably be expected to cause loss of qualification.

(d)      No Seller Benefit Plan is a "multiemployer plan" (as defined in Section 3(37) of ERISA), and none of the Sellers nor any ERISA Affiliate of any Seller has at any time sponsored or contributed to, or has or had any Liability or obligation in respect of, any multiemployer plan.

(e)      With respect to any Seller Benefit Plan that is not a "multiemployer plan" (as defined in Section 3(37) of ERISA) but is subject to Title IV of ERISA, no "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA and Section 412 of the

22

Code (whether or not waived)) has occurred, no written or oral communication has been received from the Pension Benefit Guaranty Corporation (the "PBGC") in respect of any such Seller Benefit Plan concerning the funded status of any such plan or any transfer of assets and liabilities from any such Seller Benefit Plan in connection with the transactions contemplated by this Agreement, and no administrative investigation, audit or other administrative proceeding by the Department of Labor, the PBGC, the Internal Revenue Service or other governmental agencies are pending, threatened or in progress (including any routine requests for information from the PBGC).

(f)     None of the Sellers has any obligation to provide or make available post-employment welfare benefits or welfare benefit coverage for any employee or former employee of any of the Sellers, except as may be required under COBRA and at the expense of the employee or former employee or as may be required pursuant to any other applicable law.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in combination with another event) (i) result in any payments becoming due, or increase the amount of any compensation due, to any employee of the Sellers; (ii) increase any benefits otherwise payable under any Benefit Plan; (iii) result in the acceleration of the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of any such compensation or benefits; (iv) result in the payment of any amount that would reasonably be expected, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code; (v) result in the triggering or imposition of any restrictions or limitations on the rights of the sponsor of any Seller Benefit Plan to amend or terminate such Seller Benefit Plan; or (vi) result in a violation of the privacy requirements of HIPAA.

(h)     None of the Sellers has any plan, Contract or commitment, whether legally binding or not, to create any additional employee benefit or compensation plans, policies or arrangements or, except as may be required by applicable law, to modify any Seller Benefit Plan.

(i)     From and after the Closing Date, the Buyer will not incur any liability under WARN if the Buyer makes offers of employment to Employees in accordance with Article VII, the Buyer employs the Transferred Employees as of the Closing Date in accordance with the terms of this Agreement and the Buyer continues to employ the Transferred Employees thereafter (allowing for ordinary course dismissals and terminations).  Schedule 4.13(i) shows a true and complete list of all employment terminations, day by day, for the 6 months preceding the date hereof, and shall be updated at Closing to reflect the 90 days up to the Closing Date.

(j)     Neither Seller has infringed the protected rights of any Person under any Law with respect to patent infringement, prohibited discrimination or unfair labor practices.

*Section 4.14   Environmental Matters*.  The Business is and has been in compliance with all Environmental Laws in connection with the operation of the Business.  No written notices of any violation under any Environmental Law relating to the operations of the Business have been received by the Sellers and to the Sellers' Knowledge, no such notices are threatened.  There are no Liens (other than Permitted Liens) on the Purchased Assets based upon any Environmental

Law, and there has not been any Release of Hazardous Materials, in connection with the operations of the Business.

Section 4.15    Insurance.  Schedule 4.15 sets forth a true, correct and complete list of all policies or binders of insurance held by the Sellers on the date hereof.  Schedule 4.15 describes any policy or binder of insurance that is not in full force and effect.

Section 4.16    Contracts.  Except as set forth on Schedule 4.16, none of the Sellers is a party or subject to, or bound by, nor are any of their respective properties subject to, or bound by, any Contract involving (the "Material Contracts"):

(a)    payments by or to either of the Sellers of more than $100,000 in any 12-month period from or after September 30, 2007 (but excluding nonbinding or non-executory purchase orders);

(b)    the acquisition, use, transfer, development, ownership, sharing or license of any Intellectual Property, or the indemnification of any Person with respect to infringement, misappropriation or other unauthorized use of Intellectual Property;

(c)    any change of control, consent or other similar provisions that may be or are triggered or otherwise affected by any of the transactions contemplated by this Agreement or the other Ancillary Documents;

(d)    the employment of any officer or employee (other than any Contract which is terminable without liability upon notice of 90 days or less), or any Contract of employment with a former officer or employee;

(e)    the lease or sublease (whether as lessor or lessee) of Real Property (including any improvements thereon), or an agreement or option to purchase or sell any Real Property (including any improvements thereon) from or to a third party;

(f)    any outstanding indebtedness for borrowed money by any of the Sellers, other than borrowings under the DIP Financing Facility and the Senior Secured PIK Notes;

(g)    the sharing of profits, losses, costs or liabilities with any other Person in a joint venture agreement, partnership agreement or limited liability company agreement or other agreement (however named) that is material to the Purchased Assets considered as a whole;

(h)    non-competition or exclusivity obligations which would prohibit the Buyer from operating the Business anywhere in the world after the Closing;

(i)    except for guarantees of obligations between or among the Sellers, any material guarantee or other material contingent liability in respect of any indebtedness or obligation of any Person; and

(j)    any other Contract or Contracts material to the Purchased Assets taken as a whole.

True and complete copies of each Material Contract has been made available to the Buyer.  To the Sellers' Knowledge, subject to payment of the Cure Amounts, if applicable, the Material Contracts are in full force and effect and enforceable in accordance with their terms in all material respects.  Subject to the payment of the Cure Amounts, none of the Sellers are in violation or breach of or default under any Material Contract except to the extent excused by or unenforceable as a result of the commencement or pendency of the U.S. Bankruptcy Cases or the application of any provision of the Bankruptcy Code (but only to the extent such excuse, violation, breach, default or application of law will continue to apply in favor of the Buyer and its successors and assigns following the Closing) nor, to the Sellers' Knowledge, is any other party to any such Material Contract, except to the extent, individually or in the aggregate, such violation, breach or default of such Material Contract would not reasonably be expected to materially and adversely impair operation of the Business by the Buyer after the Closing.

Section 4.17   *Suppliers*.  Schedule 4.17 sets forth the ten (10) largest suppliers of the Business in terms of purchases for the 12-month period ended May 31, 2009, showing the approximate total purchases by the Sellers from each such supplier during such time period.

Section 4.18   *Taxes*.

(a)     All material Tax Returns of the Sellers in respect to the Purchased Assets have been timely filed and are true, correct and complete in all material respects.  All material Taxes owed with respect to the Purchased Assets have been fully and timely paid.  No Governmental Authority has given written notice of any intention to initiate an audit or similar proceeding with respect to the Purchased Assets, or to assert any deficiency or claim for additional Taxes with respect to the Purchased Assets, and no such audit, deficiency or claim is currently ongoing or outstanding.

(b)     There are no outstanding agreements or requests for agreements to extend or waive the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of Taxes due from any Seller with respect to the Purchased Assets.

(c)     There are no Liens for Taxes or Income Taxes upon the assets or properties of any of the Sellers, except for Permitted Liens.

Section 4.19   *Banking Relationships*.  Schedule 4.19 sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which any of Sellers has checking, savings, custodial or other accounts of any nature, lines of credit, safety deposit boxes or lock boxes and, with respect to each account, line of credit, safety deposit box and lock box, the names of all Persons authorized to draw thereon or to have access thereto, as well as the account numbers.

Section 4.20   *Disclosure*.  No representation or warranty made by any Seller in this Agreement or in any Ancillary Document to which any Seller is a party, contains or will contain any untrue or misleading statement of a material fact or omits any material fact necessary to make the statements contained herein or therein, in light of the circumstances under which made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

*Section 5.1    Organization*.   The Buyer is duly formed, validly existing and in good standing under the Laws of the State of Delaware.

*Section 5.2    Authorization; Binding Obligation*.   The Buyer has full and unrestricted limited liability company power and authority to execute and deliver this Agreement and each other Ancillary Document to which it is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.   The execution and delivery by the Buyer of this Agreement and each other Ancillary Document to which it is a party, and the performance of its obligations hereunder and thereunder and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action, and no other corporate action or proceeding on the part of the Buyer is necessary to authorize the execution and delivery of this Agreement and each other Ancillary Document to which it is a party, the performance of its obligations hereunder and thereunder or the consummation of the transactions contemplated hereby and thereby.   This Agreement has been duly executed by the Buyer and constitutes, and each other Ancillary Document to be executed by the Buyer, when executed and delivered in connection herewith, will constitute, a legal, valid and binding obligation of the Buyer, enforceable in accordance with its terms.

*Section 5.3    Noncontravention; Consents*.

(a)    The execution and delivery by the Buyer of this Agreement and each of the other Ancillary Documents to which it is a party, the performance of and compliance with the respective terms and provisions hereof and thereof and the consummation by the Buyer of the transactions contemplated hereby and thereby, do not and will not:  (i) conflict with, or violate any provision of the certificate of formation or operating agreement of the Buyer or any other organizational or governance documents of the Buyer; or (ii) conflict with or violate any Law.

(b)    The execution and delivery by the Buyer of this Agreement and each of the other Ancillary Documents to which it is a party, the performance of and compliance with the respective terms and provisions hereof and thereof, and the consummation by the Buyer of the transactions contemplated hereby and thereby, do not and will not require any Consent or Governmental Authorization from, or filing with or notification to, any Person not a party to this Agreement.

*Section 5.4    Litigation*.   There are no legal, administrative, arbitration or other formal proceedings or governmental investigations pending or, to the Buyer's Knowledge, threatened, that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Buyer in connection with this Agreement or any of the Ancillary Documents.

## ARTICLE VI
## COVENANTS

*Section 6.1      General; Disclosure*.

(a)      Each of the Parties will use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done, as soon as practicable, all things necessary, proper or advisable (subject to any Laws) to consummate the Closing and the other transactions contemplated by this Agreement, including the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement or the Ancillary Documents.  Neither of the Parties will, without prior written consent of the other Party, take or fail to take, or permit their respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation, as soon as possible, of the transactions contemplated by this Agreement or the Ancillary Documents.

(b)      Prior to the Closing Date, each Party shall promptly notify the other Parties in writing of (i) any representation or warranty made by such notifying Party in connection with this Agreement or any Ancillary Document becoming untrue or inaccurate in any respect; (ii) the occurrence or non-occurrence of any fact, change or event, the occurrence or non-occurrence of which causes, or could reasonably be expected to cause, not to be satisfied any condition to the obligations of another Party under **Section 8.1** or **Section 8.2** to effect Closing and consummate the transactions contemplated hereby; or (iii) the failure of such notifying Party to perform or comply with any of its covenants or agreements under this Agreement or any Ancillary Document; and, in the case of clauses (i) and (iii) above, the notifying Party shall use its commercially reasonable efforts to promptly remedy such matter.  Notwithstanding the foregoing, the delivery of any notice pursuant to this **Section 6.1(b)** shall not cure any breach of any representation, warranty, covenant or agreement, or otherwise limit or affect the rights and remedies available under this Agreement to the Party receiving such notice.  From the date of this Agreement until the Closing, the Buyer and the Sellers shall each promptly notify the others in writing of any pending or threatened Legal Proceeding (i) challenging or seeking damages in connection with the transactions contemplated hereunder or (ii) seeking to restrain or prohibit the consummation of the transactions contemplated hereunder.  The Parties shall cooperate with each other in defending against any such Legal Proceeding, including seeking to have vacated or reversed any stay or temporary restraining order entered in connection therewith by any court or other Governmental Entity.

*Section 6.2      Notices and Consents*.  Prior to the Closing Date, the Sellers (at their sole cost and expense) will give all notices required to be given by the Sellers and to obtain all consents, approvals or authorizations of any third parties (including any Governmental Entity) that are required to be obtained by the Sellers in connection with the transactions contemplated by this Agreement.  Nothing contained herein will require any Party to pay any consideration (except filing and application fees) to any other Person from whom any such consents, approvals or authorizations are requested.

Section 6.3    *Conduct of the Business.*

(a)    Subject to any order of the Bankruptcy Court and the requirements of the Bankruptcy Code, the Sellers shall ensure that, after the date hereof and prior to the Closing Date, except (x) as expressly provided by or contemplated under this Agreement or (y) with the prior written consent of the Buyer:

(i)    the Sellers shall use commercially reasonable efforts under the circumstances to conduct the Business in the ordinary course consistent with past practice;

(ii)    the Sellers shall not (A) except as budgeted in connection with the DIP Financing Facility, incur any Indebtedness or (B) assume or guarantee the obligations of any other Person;

(iii)    the Sellers shall not make any loans, advances or capital contributions to, or investments in, any other Person, other than travel and entertainment advances to employees in the ordinary course of business consistent with past practice;

(iv)    the Sellers shall not sell, transfer, lease, sublease, license, relinquish, surrender, encumber or otherwise dispose of any material Purchased Asset;

(v)    the Sellers shall not change any method of accounting or accounting practice used by it (including procedures with respect to the payment of accounts payable and collection of accounts receivable), except for any change required by GAAP or Law;

(vi)    the Sellers shall not, except as may otherwise be required by applicable Law or the terms of any Sellers' Employee Benefit Plan existing as of the date of this Agreement:  (A) increase the compensation or fringe benefits of any present or former Employee or director of the Sellers, (B) grant any severance or termination pay to any present or former Employee or director of the Sellers, (C) loan or advance any money or other property to any present or former Employee or director of the Sellers, (D) establish, adopt, enter into, amend or terminate any Sellers' Employee Benefit Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Sellers' Employee Benefit Plan if it were in existence as of the date of this Agreement, or (E) grant any equity or equity-based compensation awards to any current or former Employee or director of the Sellers.

(vii)    the Sellers shall use commercially reasonable efforts under the circumstances to keep or cause to be kept its material existing insurance policies (or substantial equivalents) in such amounts duly in force as of the date hereof and shall give the Buyer notice of any material change in its insurance policies;

(viii)    the Sellers shall not agree to make any capital expenditures or acquire any business or other assets;

(ix)    the Sellers will take all commercially reasonable actions to protect and maintain the Intellectual Property that is material to the Business, including by filing

and/or prosecuting those patent applications which the Sellers in their reasonable business judgment deem to be of commercial or strategic value to the Business consistent with past practice;

(x)    the Sellers will use commercially reasonable efforts under the circumstances to cause the Leased Real Property and Equipment included in the Purchased Assets to be maintained in substantially the same condition (normal wear and tear and obsolescence excepted) that it has heretofore maintained same and shall operate the Leased Real Property in substantially the same manner as it has heretofore operated same; and the Sellers shall promptly inform the Buyer in writing of any material adverse change to the ownership, use, occupancy, leasing or operation of any Leased Real Property, whether or not insured against;

(xi)    the Sellers shall not establish, amend, modify or terminate any Employee Benefit Plan in respect of any Employee or otherwise modify (including the amount or timing of payment) the compensation of or benefits provided to, any Employee, or promise or become obligated to do any of the foregoing;

(xii)    the Sellers shall conduct the Business in compliance with Laws in all material respects, and the Sellers shall use commercially reasonable efforts under the circumstances to maintain, preserve, renew and keep in full force and effect all material Permits included in the Purchased Assets in all material respects; and

(xiii)    the Sellers shall not authorize or enter into any Contract to take any action or fail to take any action that would reasonably be expected to constitute a breach of any of the foregoing.

(b)    Prior to the Closing, each Seller shall (i) exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the operation of the Business and (ii) use its commercially reasonable efforts under the circumstances to preserve intact its business organizations and relationships with third parties relating to the Business and to keep available the services of its respective current officers and key employees, subject to the terms of this Agreement, and in each case, subject to any obligations as a debtor or debtor-in-possession under the Bankruptcy Code or order of the Bankruptcy Court or other court of competent jurisdiction.

*Section 6.4    Transfer Taxes*.    The Sellers and the Buyer will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers and deliveries to be made to the Buyer hereunder from any transfer, sales, use, stamp duty, value-added, documentary, registration, recording and other similar Taxes (collectively, "Transfer Taxes") payable in connection with such sale, conveyance, assignments, transfers and deliveries, to the extent provided by Section 1146(c) of the Bankruptcy Code and other applicable Law.  In the event that any Transfer Taxes are assessed or are required to be paid with respect to such sale, conveyance, assignments, transfers or deliveries, such Transfer Taxes shall be borne and paid by the Sellers out of proceeds of the Sellers' Cash Purchase Price Consideration.  The Sellers and the Buyer will execute, deliver and cooperate in timely filing all Tax Returns required to be filed in connection with the payment of such Taxes.

Section 6.5    Prorations.  All Taxes and all rents, utilities and other charges against, or payable with respect to, any of the Purchased Assets relating to a time period beginning prior to, and ending after, the Closing (the "Apportioned Obligations") shall be calculated as of Closing, and shall be prorated (based on the most recent available tax statement, latest tax valuation and latest bills) based on the number of days in the relevant period falling on and before the Closing (the "Pre-Closing Period"), and the number of days in the relevant period falling after the Closing (the "Post-Closing Period").  If the Closing occurs before the amount of an Apportioned Obligation is fixed for a relevant time period, the amount of such Apportioned Obligation shall be deemed to be calculated based on the amount of such Apportioned Obligation for the prior equivalent time period.  The Sellers will be responsible for the Apportioned Obligations allocated to the Pre-Closing Period, and the Buyer will be responsible for the Apportioned Obligations allocated to the Post-Closing Period.  The Sellers will pay Apportioned Obligations that are due and payable on or prior to the Closing Date, and will be paid at Closing by the Buyer for any part of that amount apportioned to the Buyer.  The Buyer will pay Apportioned Obligations that are due and payable after the Closing Date and will be paid at Closing by the Sellers for any part of that amount apportioned to the Sellers.  Any refund, rebate or similar payment received by or credited to either the Buyer or the Seller that is properly apportioned to the other Party pursuant to the principles of this **Section 6.5** will be timely paid over to such other Party.

Section 6.6    Access to Business, Records and Documents.  From the date hereof to the Closing, the Sellers shall (i) afford to the Buyer and its Representatives full and free access to all of the Purchased Assets and all of the Sellers' and Sellers' Representatives' books, records, officers, employees, advisors, counsel, facilities, properties, documents and other information (in whatever medium, including any and all information relating to customer profitability on a part-by-part basis); and (ii) furnish promptly to the Buyer, upon its request, copies of all such books, records, documents and information.

Section 6.7    Bankruptcy Proceedings.

(a)    Each of the Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bid Procedures Order (the "Initial Bankruptcy Motion").

(b)    (i) The Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter the Bid Procedures Order within ten (10) days after the Initial Bankruptcy Motion, and (ii) the Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter the Approval Order within sixty (60) days after the Initial Bankruptcy Motion, which date the Buyer may waive or extend in its reasonable discretion; provided the Buyer is the successful bidder at the Auction.

(c)    The term "Bid Procedures Order" means an order from the Bankruptcy Court pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code (i) authorizing and scheduling an auction (the "Auction"); (ii) approving the procedures for the submission of Qualified Bids and providing that all Qualified Bids shall be served upon the Buyer; (iii) in the case of any subsequent Qualified Bids, approving an initial overbid of $75,000 and incremental bid protections of at least $25,000 thereafter; (iv) approving the payment of the DIP Payment Amount and Break-Up Fee as a first priority administrative expense under sections 503(b)(1) and

507(a)(1) of the Bankruptcy Code and authorizing the Buyer to "credit bid" the DIP Payment Amount at the Auction; (v) scheduling a hearing to consider approval of such sale; (vii) approving the form and manner of notice of bid procedures and sale hearing; and (viii) approving procedures for the assumption of executory Contracts and unexpired leases, which order shall be submitted to the Bankruptcy Court in form and substance reasonably acceptable in all respects to the Buyer and otherwise consistent with this Agreement.

(d)     The term "Approval Order" means an order from the Bankruptcy Court, in form and substance reasonably satisfactory in all respects to the Buyer and otherwise consistent with this Agreement, and approving the sale of the Purchased Assets to the Buyer and the assumption of the Assumed Contracts and Assumed Liabilities by the Buyer and the conveyance of permits under this Agreement pursuant to Sections 105, 363(b), 363(f) and 365 of the Bankruptcy Code, and which, among other things, (i) approves the transaction contemplated by this Agreement on the terms set forth herein; (ii) finds that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to the Buyer and shall vest the Buyer with title to the Purchased Assets free and clear of all Liens, other than Permitted Liens; (iii) finds that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets; (iv) finds that, as of the Closing Date, the Assumed Contracts will have been duly assumed by the Sellers and assigned to the Buyer in accordance with Sections 365 and 105 of the Bankruptcy Code; (v) finds that the Buyer is a "good faith Buyer" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arm's-length Buyer; (vi) finds that this Agreement was negotiated at arm's-length and not by any means prohibited by Law; (vii) finds that the Buyer does not have any interest in the Sellers or in any party affiliated with the Sellers; (viii) finds that the sale of the Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; (ix) orders that the Assumed Contracts assumed by the Sellers and assigned to the Buyer pursuant to this Agreement will be transferred to, and remain in full force and effect for the benefit of, the Buyer (or its designated transferee(s)), notwithstanding any provision in any such Assumed Contract or in applicable law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer; (x) approves the Ancillary Documents; (xi) finds that the Buyer gave due and proper notice of the transaction contemplated by this Agreement to each party entitled thereto; (xii) finds that the Buyer is not a successor of the Sellers; and (xiii) orders that, notwithstanding Sections 6004(g) and 6006(d) of the Bankruptcy Code, the Approval Order is not stayed and is effective immediately upon entering.

(e)     (i) The Buyer shall have until the date that is five (5) business days prior to the Auction to designate, by written notice to the Sellers, the Assumed Contracts that it wishes the Sellers assign to the Buyer, and the Assumed Contracts so identified in such notice shall be set forth on Schedule 2.2(a)(ii); and (ii) no less than two (2) business days prior to the hearing for the Approval Order, the Buyer may elect, by written notice to the Sellers, to have any of the executory Contracts or unexpired leases set forth on Schedule 2.2(a)(ii) not be assigned to and assumed by the Buyer, and any such Contracts or leases so identified in such notice shall be removed from Schedule 2.2(a)(ii).

(f)     The Sellers shall provide the Buyer with drafts of all material documents, motions, orders, filings or pleadings that the Sellers propose to file with the Bankruptcy Court which relate to (i) the entry of the orders described in this **Section 6.7**; (ii) the transactions contemplated by this Agreement, including in connection with the approval of the Approval Order; (iii) the assumption or rejection of any executory Contract or unexpired lease of the Sellers; (iv) the settlement of any Claim against the Sellers; (v) the restructuring or refinancing of any form of Indebtedness or lease of the Sellers; and (vi) the appointment of a trustee or examiner under Chapter 11 of the Bankruptcy Code, in the Bankruptcy Case, so as to provide the Buyer's counsel with a reasonable opportunity to review and comment on the same prior to the filing thereof in the Bankruptcy Court.  The Sellers shall give appropriate notice and provide appropriate opportunity for a hearing to all parties entitled thereto of all motions, orders, hearings, or other proceedings relating to this Agreement or the transactions contemplated by this Agreement, including in connection with the approval of the Approval Order.  The Sellers shall be required to consult and reasonably cooperate with the Buyer and consider, in good faith, the views of the Buyer with respect to the filings contemplated under this Agreement.

(g)     The Sellers shall comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Purchased Assets under this Agreement.  Except as otherwise permitted by the Bankruptcy Court, notice of all applicable hearings, motions and orders and the objection deadline shall be served by the Sellers in accordance with Rules 2002, 6004, 6006, 9014 and any other applicable rule of the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Court on all Persons required to receive notice in the Bankruptcy Case under such rules, including all Persons who have asserted Liens with respect to the Purchased Assets, all non-debtor parties to all Assumed Contracts, the Office of the United States Trustee, all indenture trustees for debt issued by the Sellers, and each of the Sellers' creditors.

(h)     If the Bid Procedures Order, Approval Order or any other order of the Bankruptcy Court relating to this Agreement is objected to or appealed by any party (or a petition for certiorari, motion for re-hearing, reargument, reconsideration or revocation, or other motion attaching the order, is filed with respect thereto), the Sellers will use their commercially reasonable efforts to defend against such objection, appeal, petition or motion and to obtain an expedited resolution of any such appeal, petition or motion, in any such case, with the objective of effecting the transactions contemplated by this Agreement on the terms and subject to the conditions set forth herein.

(i)     Notwithstanding anything to the contrary contained in this Agreement, in the event the Buyer so requests in writing within 30 days after the Closing, the Sellers agree to pursue (at the Buyer's sole cost and expense) any claims for insurance for damage to or destruction of any Purchased Asset in connection with matters arising after the Petition Date but prior to the Closing Date, and to remit any proceeds received with respect thereto, net of any costs and expenses incurred by the Sellers, to the Buyer.

(j)     Certain Indebtedness of the Sellers are secured by Liens on certain of the Purchased Assets.  Pursuant to and by virtue of the Approval Order, all such Liens (other than

Permitted Liens) will be discharged and will attach to the proceeds from the sale of the Purchased Assets.

(k)     Promptly after the entry of the Bid Procedures Order, the Sellers shall serve on all parties (including all parties to the Assumed Contracts and all Persons who would appear on any search conducted to determine those Persons asserting a Lien on the Sellers' assets) to whom service of the Sale Notice (as defined in the Bid Procedures Order) is required under the terms of the Bid Procedures Order notice, in form and substance reasonably satisfactory to the Buyer, disclosing the material terms of this Agreement, the Bid Procedures Order (including the procedure for the submission of Qualified Bids) and the identity of the Buyer.

(l)     The Sellers agree that they shall promptly take such actions as are reasonably necessary to obtain the entry of an order of the U.S. Bankruptcy Court, in form and substance reasonably satisfactory to the Buyer and otherwise consistent with this Agreement, which shall provide for the assumption of and assignment to the Buyer of the Assumed Contracts and Permits being conveyed hereunder and thereunder, and the payment of all Cure Amounts by the Buyer as set forth in **Section 3.2**.

    *Section 6.8     Alternative Transactions.*

(a)     Prior to the Initial Bankruptcy Motion, the Sellers are prohibited from (i) soliciting, initiating or encouraging (including by way of furnishing information), or taking any other action designed to facilitate, any inquiries or the making of any proposal which constitutes an Alternative Transaction or (ii) participating in any discussions or negotiations regarding, or furnishing to any Person (other than its legal and other business advisors) any information with respect to, or taking any action to knowingly facilitate, any Alternative Transaction or the making of any Alternative Transaction, in each of the foregoing cases, subject to the fiduciary obligations of the board of directors of PDT-NV.  The Sellers shall promptly disclose to the Buyer any unsolicited offers for an Alternative Transaction and the proposed terms and conditions thereof.

(b)     From and after the Initial Bankruptcy Motion, the Sellers are permitted to, and to cause their representatives and Affiliates to, initiate contact with, solicit or encourage (including by way of furnishing information), or take any other action designed to facilitate, the submission of any Alternative Transactions and any inquiries, proposals or offers by any Person (in addition to the Buyer and its Affiliates, agents and representatives) that might lead to an Alternative Transaction and to engage in any discussions and negotiations relating thereto, so long as the Sellers give the Buyer notice of such discussions, adhere to the Bid Procedures Order and do not sign a definitive agreement for any such Alternative Transaction absent Bankruptcy Court approval.  In addition, the Sellers may respond to any Alternative Transactions and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and Purchased Assets.

    *Section 6.9     Publicity.*  Following the date hereof, until the Closing or the date the Agreement is terminated or abandoned pursuant to **Article IX**, the Sellers and the Buyer may not issue or cause the publication of any press release or other general media communication with respect to this Agreement or the transactions contemplated hereby, including communications with the Sellers' employees, creditors, customers and suppliers, without prior consultation with

the other Party except as required as part of the Bid Procedures or the Bankruptcy Case, provided, that each Party shall provide the other with a reasonable opportunity to review and comment on any such press release or general media communication.

Section 6.10   *Contacts with Suppliers, Customers and Other Parties*.   Prior to the Closing, except as required by Law, the Buyer and its representatives may, with the consent of the Sellers, not to be unreasonably withheld or delayed, contact, and discuss this Agreement and the transactions contemplated hereby with, any supplier to, or customer of, the Business, counterparties to any Contracts or any Governmental Entity and, with the participation of the Sellers, any employees of the Sellers or organized labor representative.

Section 6.11   *Real Property Leases*.   Prior to the Closing Date, no Seller shall amend, modify, supplement, extend, renew or terminate any Real Property Lease, or enter into any agreement otherwise affecting the Leased Real Property (including property management agreements, service agreements, subleases or licenses with respect thereto) without the Buyer's prior written consent in each such instance.

Section 6.12   *Confidentiality*.   From and after the Closing, the Sellers shall not, and shall cause their Affiliates not to, without first obtaining the written consent of the Buyer (which consent may be withheld in the Buyer's sole discretion), directly or indirectly, reveal, report, disclose or use any information related to the Business, the Purchased Assets, this Agreement and the Ancillary Documents, or any of the terms, conditions, negotiations or other information with respect hereto and thereto or the transactions contemplated hereby and thereby (collectively, the "Confidential Information"), whether furnished before or after the Closing, whether documentary, electronic or oral, whether labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it is or was furnished. Notwithstanding the foregoing, the Sellers and their Affiliates may disclose such Confidential Information as they determine in good faith and upon the written advice of independent, outside counsel is required by Law, but only to the extent so required (in which event the Sellers and their Affiliates shall consult in advance with the Buyer regarding the nature, extent and form of such disclosure). If the Sellers or their Affiliates are requested or required (by oral questions, interrogatories, requests for information or other documents in legal proceedings, subpoena, civil investigative demand or any other similar process) to disclose any Confidential Information, the Sellers and their Affiliates shall provide the Buyer with prompt written notice (but in any event not less than ten (10) days advance notice) of any such request or requirement so that Buyer shall have an opportunity to seek a protective order or other appropriate remedy. If the Buyer provides a written waiver of such Sellers' and Affiliates' obligations to comply with any portion of this **Section 6.12** with respect to a specific request or requirement, such Seller or Affiliate shall disclose only that portion of the Confidential Information or other information that is specifically permitted by such waiver and that is necessary to disclose in order to comply with such request or requirement. Notwithstanding the foregoing, in the event that the a Seller is required to disclose any Confidential Information, the Sellers and their Affiliates shall exercise their commercially reasonable efforts to preserve the confidentiality of such Confidential Information, including by cooperating with the Buyer to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Confidential Information, as reasonably requested by the Buyer.

Section 6.13    *Employment Contracts of Key Employees*. **[The Sellers shall cause each of (i) [_____], (ii) [_____] and (iii) [_____], (the "Key Employees") respectively, to enter into at the Closing, an employment agreement in form and substance satisfactory to the Buyer in its sole discretion.] [Note: If existing employee contracts assumed, then this provision is unnecessary.  Further analysis to be conducted].**

## ARTICLE VII
## EMPLOYEE MATTERS

Section 7.1    *Employment.*

(a)    The Buyer will offer (on terms and conditions to be determined by the Buyer, in its sole discretion) to employ, commencing upon the Closing, each Employee of the Sellers and (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business or (iii) on a leave of absence approved by the Sellers in connection with the Business ("Employees") but not including any person on long-term disability or on a leave of absence with no prior agreement or understanding to return to employment with the Sellers at the end of such disability, layoff or leave.  Employees who accept such offer of employment will be referred to in this Agreement as "Transferred Employees." Schedule 7.1(a) sets forth a list of all Employees as of the date hereof.

(b)    Except as described in the remaining sentences of this **Section 7.1(b)**, the employment of each such Transferred Employee with the Buyer will commence immediately upon the Closing.  In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with the Buyer will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date.

Section 7.2    *Employee Benefit Matters.*

(a)    As of the Closing, all of the Transferred Employees will cease participation in any of the Sellers' Employee Benefit Plans and fringe benefit programs that such Transferred Employees participated in immediately prior to the Closing.  Transferred Employees shall be fully vested in their defined contribution accounts as of the Effective Time.

(b)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, after the Closing Date, the Buyer shall assume responsibility for providing and administering all required notices and benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to all Transferred Employees entitled by Law to such notices and/or benefits with respect to periods after the Closing Date.  The Buyer shall have no COBRA Liability or obligations in respect of events or circumstances occurring or existing on or prior to the Closing Date.

**ARTICLE VIII**
**CLOSING CONDITIONS**

Section 8.1    *Conditions to Obligations of the Buyer.*  The obligations of the Buyer to effect the Closing are subject to the fulfillment or waiver on or before the Closing of the following conditions:

(a)    Each of the representations and warranties of the Sellers contained in this Agreement and the other Ancillary Documents shall be true and correct in all material respects (except that any representation or warranty expressly qualified as to materiality or with respect to the Sellers' Knowledge shall be true and correct in all respects giving effect to such qualifier) as of the date hereof and the Closing Date as though made on and as of such dates, except for representations and warranties that by their express terms address matters only as of a particular date, which representations and warranties shall be true and correct in all material respects (except that any representation or warranty expressly qualified as to materiality or with respect to the Sellers' Knowledge shall be true and correct in all respects giving effect to such qualifier) as of such date as though made on the date hereof and on the Closing Date.

(b)    Each Seller shall have performed and complied with in all material respects all agreements and covenants required by this Agreement and the other Ancillary Documents to be performed or complied with by such Seller on or prior to the Closing Date.

(c)    All of the Required Consents shall have been obtained or given, as applicable, and be in full force and effect.

(d)    There shall be no litigation pending or, to the Sellers' Knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens, except Permitted Liens.

(e)    The Sellers, as applicable, will have delivered to the Buyer:

(i)    a certificate, dated the Closing Date, duly executed by an officer of each of the Sellers to the effect of **Section 8.1(a)** and **8.1(b)** above;

(ii)    a duly executed counterpart of the bill of sale and assignment and assumption agreement in the form attached as Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement");

(iii)    a duly executed counterpart of the assignment of patents in the form attached as Exhibit B (the "Assignment of Patents");

(iv)    evidence reasonably satisfactory to the Buyer that the Sellers own all right, title and interest in and to all of the Purchased Intellectual Property, including the Intellectual Property set forth on Schedule 4.10(a), free and clear of all Liens (except for Permitted Liens) and, if applicable, that such Purchased Intellectual Property is properly recorded in the name of one of the Sellers, without any gaps or breaks in the chain-of-title; and

36

(v)      such other instruments of sale, transfer, conveyance and assignment as the Buyer may reasonably request to effect the transactions contemplated thereby.

(f)      The Bankruptcy Court shall have entered the Bid Procedures Order within twenty (20) days after the Initial Bankruptcy Motion and the Approval Order within sixty (60) days after the Initial Bankruptcy Motion.

(g)      The Bid Procedures Order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without prior written consent of the Buyer and the Sellers.

(h)      The Approval Order shall be a Final Order and have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Buyer and the Sellers.

(i)      Each Seller shall have furnished the Buyer with a certificate stating that such Seller is not a "foreign" Person within the meaning of Section 1445 of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulation Section 1.1445-2(b)(2).

(j)      The Real Property Lease set forth on Schedule 8.1(j) shall have been amended or modified, with material terms reasonably satisfactory to the Buyer.

Section 8.2      *Conditions to Obligations of the Sellers*.  The obligations of the Sellers to effect the Closing are subject to the fulfillment or waiver on or before the Closing of the following conditions:

(a)      Each of the representations and warranties of the Buyer contained in this Agreement and the other Ancillary Documents shall be true and correct in all material respects (except that any representation or warranty expressly qualified as to materiality shall be true and correct in all respects giving effect to such qualifier) as of the date hereof and the Closing Date as though made on and as of such dates, except for representations and warranties that by their express terms address matters only as of a particular date, which representations and warranties shall be true and correct in all material respects (except that any representation or warranty expressly qualified as to materiality shall be true and correct in all respects giving effect to such qualifier) as of such date as though made on the date hereof and on the Closing Date.

(b)      Buyer shall have performed and complied with in all material respects all agreements and covenants required by this Agreement and the other Ancillary Documents to be performed or complied with by Buyer on or prior to the Closing Date.

(c)      The Buyer shall have delivered to the Sellers:

(i)      the Cash Purchase Price Component in cash by wire transfer of immediately available funds to the account or accounts designated by the Sellers;

(ii)      the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer;

(iii)    the Assignment of Patents, duly executed by the Buyer; and

(iv)    such other instruments of sale, transfer, conveyance and assignment as the Sellers may reasonably request to effect the transactions contemplated thereby.

(d)    The Bankruptcy Court shall have entered the Bid Procedures Order within twenty (20) days after the Initial Bankruptcy Motion and the Approval Order within sixty (60) days after the Initial Bankruptcy Motion.

(e)    The Bid Procedures Order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Buyer and the Sellers.

## ARTICLE IX
## TERMINATION

*Section 9.1    Termination of Agreement*.  This Agreement may be terminated at any time prior to Closing and the transactions contemplated hereby may be abandoned:

(a)    by the mutual written consent of the Sellers and the Buyer;

(b)    by the Sellers or the Buyer if any court of competent jurisdiction or governmental body, authority or agency having jurisdiction, including the Bankruptcy Court, shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the Parties hereto shall use commercially reasonable efforts to lift) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable;

(c)    by the Sellers, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Buyer which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in **Section 8.2** impossible and such breach has not been cured within fifteen (15) days following the Sellers' written notice of such breach; provided, that the right to terminate this Agreement under this **Section 9.1(c)** shall not be available to the Sellers if the Sellers are in material breach of this Agreement;

(d)    by the Buyer, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Sellers which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in **Section 8.1** impossible and such breach has not been cured within fifteen (15) days following the Buyer's written notice of such breach; provided, that that the right to terminate this Agreement under this **Section 9.1(d)** shall not be available to the Buyer if the Buyer is in material breach of this Agreement;

(e)    by the Buyer if the Sellers enter into an agreement respecting or file a motion seeking authority to consummate an Alternative Transaction in the Bankruptcy Case or file a motion in the Bankruptcy Case seeking authority to enter into or consummate any plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization

or other reorganization that is inconsistent with the consummation of the transactions contemplated by this Agreement.

(f)     by the Sellers, if the Buyer is not the successful bidder at the Auction; <u>provided</u>, that the Sellers have not materially breached their obligations hereunder and have complied in all material respects with this Agreement and the Bid Procedures Order;

(g)     by the Buyer, upon written notice given to the Seller, if the Closing shall not have occurred on or before ten (10) days after entry of the Approval Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this **Section 9.1(g)** shall not be available to the Buyer if the Buyer has failed to perform in all material respects its obligations under this Agreement and such failure has been the cause of, or results in, the failure of the Closing to occur on or prior to ten (10) days after entry of the Approval Order;

(h)     by the Buyer prior to the entry of the Bid Procedures Order, if the Bid Procedures Order is not entered by the Bankruptcy Court within twenty (20) days of the Initial Bankruptcy Motion (or such later date as the Buyer shall agree); and

(i)     by the Buyer prior to the entry of the Approval Order, if the Approval Order is not entered by the Bankruptcy Court within sixty (60) days after the Initial Bankruptcy Motion.

Section 9.2     *Effect of Termination*.  If any Party terminates this Agreement pursuant to **Section 9.1** above, all of the unperformed obligations of the Parties hereunder shall terminate without any liability of any Party to such other Party; <u>provided</u>, that nothing herein shall relieve any Party from any Liability for any breach of this Agreement or the Sellers from Liability (if any) under **Section 9.3**.

Section 9.3     *Break-Up Fee*.

(a)     In the event this Agreement is terminated by the Sellers, or by the Buyer pursuant to **Section 9.1(e)(i)**, and the Sellers within 180 days thereafter consummate an Alternative Transaction with a third party other than the Buyer or any of its Affiliates, the Sellers shall pay to the Buyer (or its designee) a break-up fee of $75,000 (the "<u>Break-Up Fee</u>") from the proceeds of the Alternative Transaction, which Break Up Fee payable under this **Section 9.3(a)** shall constitute an administrative expense claim in the Bankruptcy Case under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(b)     The payment of the Break-Up Fee shall be made by wire transfer of immediately available funds on the fifth business day following the later of (i) consummation of the Alternative Transaction and (ii) receipt by the Sellers of a notice from the Buyer stating the reasons why such Break-Up Fee are due, including, if applicable, that the transactions contemplated in this Agreement have been (or will be) terminated.

## ARTICLE X
## MISCELLANEOUS

Section 10.1   *Notices*.  Any notice, request, instruction or other document to be given hereunder will be sent in writing and delivered personally, sent by reputable, overnight courier

service (charges prepaid), sent by electronic mail (provided that a copy is also sent by reputable, overnight courier service (charges prepared)), sent by registered or certified mail, postage prepaid, or by facsimile, according to the instructions set forth below. Such notices will be deemed given: at the time delivered by hand, if personally delivered; one business day after being sent, if sent by reputable, overnight courier service or by electronic mail followed by such courier service); at the time received, if sent by registered or certified mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

| | |
|---|---|
| If to any Seller: | Particle Drilling Technologies, Inc. |
| | [_____] |
| | [_____] |
| | Attention:  [_____] |
| | Facsimile No.:  [_____] |
| | Email: [_____] |
| | |
| With a copy (which will not constitute notice) to: | [_____] |
| | [_____] |
| | [_____] |
| | Attention:  [_____] |
| | Facsimile No.:  [_____] |
| | Email: [_____] |
| | |
| If to the Buyer: | [_____] |
| | [_____] |
| | [_____] |
| | Attention:  [_____] |
| | Facsimile No.:  [_____] |
| | Email: [_____] |
| | |
| With a copy (which will not constitute notice) to: | Jenner & Block LLP |
| | 330 N. Wabash Avenue |
| | Chicago, IL  60611-7603 |
| | Attention:  Jerry J. Burgdoerfer |
| | Facsimile No.:  312-840-7220 |
| | Email: JBurgdoerfer@jenner.com |

or to such other address or to the attention of such other party that the recipient party has specified by prior written notice to the sending party in accordance with the preceding.

Section 10.2   Expenses.  Except as expressly provided in this Agreement, each of the Buyer and the Sellers, and their respective Affiliates, will bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated.

Section 10.3    *Seller Disclosure Schedules*.  The representations and warranties of the Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Seller Disclosure Schedules.  The Sellers will not be, nor will they be deemed to be, in breach of any such representations and warranties in connection with any such matter so disclosed in the Seller Disclosure Schedules.  Inclusion of information in the Seller Disclosure Schedules will not be construed as an admission that such information is material to the business, operations or condition (financial or otherwise) of the Business or the Purchased Assets, taken as a whole, or as an admission of liability or obligation of the Sellers to any third party.  The specific disclosures set forth in the Seller Disclosure Schedules have been organized to correspond to Section references in this Agreement to which the disclosure most clearly relate, together with appropriate cross references when disclosure is applicable to other Sections of this Agreement; provided, however, that any disclosure in the Seller Disclosure Schedules will apply to and will be deemed to be disclosed for purposes of other Sections of this Agreement to the extent it is reasonably apparent that such disclosure relates to such Section.  In the event that there is any inconsistency between this Agreement and matters disclosed in the Seller Disclosure Schedules, information contained in the Seller Disclosure Schedules will prevail and will be deemed to be the relevant disclosure.

Section 10.4    *Bulk Sales or Transfer Laws*.  The Buyer waives compliance by the Sellers with the provisions of any bulk sales laws that may be applicable to the transactions contemplated by this Agreement.

Section 10.5    *Assignment; Successors and Assigns*.  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; provided, however, that, without the consent of the Sellers, the Buyer may assign and delegate its rights under this Agreement to one or more Affiliates of the Buyer or to any party providing financing to the Buyer; provided further that, no such assignment or delegation shall relieve the Buyer of its obligations under this Agreement.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 10.6    *Amendment; Waiver*.  This Agreement may be amended by a written instrument executed and delivered by the Sellers and the Buyer.  At any time prior to the Closing, the Parties may extend the time for performance of or waive compliance with any of the covenants or agreements of the other Party to this Agreement, and may waive any breach of the representations or warranties of such other Party.  No agreement extending or waiving any provision of this Agreement will be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

Section 10.7    *Severability; Specific Performance*.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be prohibited by or invalid under Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.  Each Party acknowledges and agrees that the other Party may be irreparably damaged if any provision of this Agreement is not performed in accordance with its terms or otherwise is breached.  Accordingly, each Party agrees that the other Party may be

entitled, subject to a determination by a court of competent jurisdiction, to injunctive relief to prevent any such failure of performance or breach and to enforce specifically this Agreement and any of the terms and provisions hereof.

Section 10.8   *Counterparts*.   This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all such counterparts taken together will constitute one and the same Agreement.  All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

Section 10.9   *Descriptive Headings*.   The descriptive headings of this Agreement are inserted for convenience only and will not constitute a part of this Agreement.

Section 10.10  *No Third-Party Beneficiaries*.   This Agreement will not confer any rights or remedies upon any Person or entity other than the Parties hereto, their respective successors and permitted assigns.

Section 10.11 *Entire Agreement*.   This Agreement and the Ancillary Documents collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 10.12 *Exhibits and Schedules*.   The Exhibits and Schedules attached to this Agreement are made a part of this Agreement as if set forth fully herein.

Section 10.13 *GOVERNING LAW*.   THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY LAW OR RULE (INCLUDING CONFLICTS OF LAW PRINCIPLES) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE TO BE APPLIED.

Section 10.14  *Jurisdiction*.  Buyer and Sellers irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).  After the Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, each of the Sellers and the Buyer irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of Illinois and the United States of America, in each case located in Chicago ("Selected Courts") for any litigation arising out of or relating out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating hereto except in such courts) and waives any objection to venue being laid in the Selected Courts whether based on the grounds of forum non conveniens or otherwise.

Section 10.15 *WAIVER OF JURY TRIAL*.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY

LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement on the date first written above.

PARTICLE DRILLING TECHNOLOGIES, INC.,
a Delaware corporation


By:  _____
     Name:
     Title:


PARTICLE DRILLING TECHNOLOGIES, INC.,
a Nevada corporation


By:  _____
     Name:
     Title:


PDTI HOLDINGS, LLC


By:  _____
     Name:  Edward F. Heil
     Title:  Managing Member

44

**EXHIBIT B**

**Schedule of Executory Contracts and Unexpired Leases to be Assumed and Assigned**

**[TO BE FILED PRIOR TO HEARING ON SALES PROCEDURES MOTION]**