IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PARTICLE DRILLING | § | Case No. 09-33744-H1-11 |
| TECHNOLOGIES, INC., | § | |
| A NEVADA CORPORATION *et al.* | § | Jointly Administered |
| | § | |
| Debtors. | § | |

**DEBTORS' EMERGENCY MOTION FOR ORDER: (A) SCHEDULING AN AUCTION; (B) SCHEDULING THE DATE, TIME AND PLACE FOR A HEARING ON THE PROPOSED SALE MOTION; (C) APPROVING THE FORM AND MANNER OF THE NOTICE OF (I) AUCTION AND SALE HEARING, AND (II) PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE COSTS RELATING THERETO; AND (D) APPROVING THE (I) BIDDING PROCEDURES, AND (II) BREAK-UP FEES**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 24, 2009, AT 4:00 P.M., BEFORE THE HONORABLE MARVIN ISGUR, IN COURTROOM 404, 4TH FLOOR, 515 RUSK, HOUSTON, TEXAS.**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Particle Drilling Technologies, Inc., a Nevada Corporation and Particle Drilling

Technologies, Inc., a Delaware Corporation (collectively "PDTI" or "Debtors"), file this

Emergency Motion For Order: (A) Scheduling An Auction; (B) Scheduling The Date, Time And Place For A Hearing On The Proposed Sale Motion; (C) Approving The Form And Manner Of The Notice Of (i) Auction And Sale Hearing, And (ii) Proposed Assumption And Assignment Of Executory Contracts And Unexpired Leases And Proposed Cure Costs Relating Thereto; And (D) Approving The (i) Bidding Procedures, And (ii) Break-Up Fees (the "Motion" or "Sale Procedures Motion").  A proposed order granting this Sale Procedures Motion is attached hereto. In support of this Sale Procedures Motion, the Debtors respectfully represent as follows:

## Introduction

1.      By this Motion, the Debtors seek an order establishing an efficient, fair, and open framework for generating bids to acquire the Debtors' assets.  The case has been set on a fast track for confirmation, with the Court establishing abbreviated deadlines pertaining to the disclosure statement and confirmation filings. The Debtor must file a plan and disclosure statement with the Court no later than June 15, 2009, with a hearing to conditionally approve Debtor's disclosure statement set for June 24, 2009 and confirmation on July 29, 2009.  A central feature of the Debtors' bankruptcy will be a sale under section 363 of the Bankruptcy Code of substantially all of the Debtors assets.  The bidding procedures requested in this Motion are intended and designed to obtain the highest and best offers for the Assets, thereby maximizing the value of the estates.

2.      By this Motion, the Debtors seek the establishment of relevant dates and deadlines, as well as approval of certain notices and bidding procedures, for the proposed sale of substantially all of the Debtors' assets to PDTI Holdings, LLC (the "Proposed Purchaser"), an entity wholly-owned by Edward F. Heil ("Heil"), or to the Qualified Bidder (as hereafter defined) with the highest or otherwise best bid, at an auction (the "Auction") to be conducted at a date to be determined by this Court.  The Proposed Purchaser is a third party, not comprised of

insiders of the Debtors, with no affiliation to the Debtors.  The Debtors are not seeking through this Motion the actual approval of the sale, which sale approval will be sought pursuant to another motion being filed concurrently herewith.

## Jurisdiction

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 363 and 365, and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

5.     Debtors Particle Drilling Technologies, Inc., a Nevada Corporation ("PDTI Nev" or "Debtor") and Particle Drilling Technologies, Inc., a Delaware Corporation ("PDTI Del" or "Debtor") filed voluntary petitions under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on May 30, 2009 and June 1, 2009, respectively (collectively the "Petition Date").  PDTI Nev and PDTI Del are collectively referred to hereafter as "Debtors". The Debtors continues to operate their business and manage their property as a debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' bankruptcy case and no official committee of unsecured creditors has been established yet.

6.      PDTI Nev is a Nevada corporation based in Houston, Texas that is a development stage company operating in the oilfield service and technology industry.  PDTI Nev was organized on June 14, 2002 and was formerly known as MedXLink Corp.  The name was

changed to Particle Drilling Technologies, Inc. on January 25, 2005. PDTI Nev is currently developing an advanced drilling technology to be offered to the energy industry.

7.     PDTI owns 100% of the stock of PDTI Del, which is a non-operating entity.

8.     PDTI Nev was formed to commercialize its patented and patent-pending Particle Impact Drilling ("PID") system which is a mobile system that readily adapts to conventional drilling rigs and is designed to provide a radical increase in penetration rates for drilling oil and gas wells, particularly through deep hard and abrasive zones or other difficult-to-drill formations.

9.     The purpose of the PID system is to improve drilling efficiencies and significantly improve overall economics to the energy industry in regions around the world where slow drilling rates result in high costs to find and develop oil and gas reserves. The PID system utilizes a specially designed "fit for purpose" drill bit fitted with jetting nozzles and polycrystalline diamond compact cutting structures for penetrating hard-rock formations in the exploration of oil and gas. This technology will dramatically improve drilling efficiency in the energy industry; thereby making new energy reserves economically available through a significant reduction in finding and development costs.

10.     PDTI Nev is a publicly traded company whose shares of common stock have been traded on NASDAQ. However, NASDAQ recently delisted PDTI Nev stock and trading is currently conducted in the Pink Sheets electronic OTC markets. As of March 31, 2009, the number of outstanding shares of PDTI Nev common stock was 35,740,349. There are approximately 230 shareholders.

11.     Because PDTI Nev is currently a development stage company, it generates no revenue and its continued existence is dependent upon its successful development of the PID technology and its ability to successfully commercialize this technology. PDTI has yet to

generate cash flow from operations, and until revenues commence, PDTI is highly dependent upon debt and equity funding.

12.     Since its inception, PDTI Nev has financed its operations through private sales of equity, a subscription rights offering, the issuance of convertible notes, and the issuance of a PIK note, with net proceeds totaling $37,793,075 through March 31, 2009.

13.     Additionally, as of March 31, 2009, PDTI Nev had assets of $2,884,606 and liabilities of $1,476,092. For the three and six months ended March 31, 2009, PDTI Nev reported net losses of approximately $1.6 million and $3.6 million, respectively, as compared to net losses of approximately $2.3 million and $5.6 million for the three and six months ended March 31, 2008, respectively. PDTI Nev has recently downsized its operations, decreasing its employee base from twenty one (21) to twelve (12) employees.

14.     On October 17, 2008, the Board of Directors of PDTI Nev engaged Parks Paton Hoepfl & Brown ("PPH&B") to assist the Board in evaluating strategic alternatives available to the Company which would enable a more rapid commercialization of the Company's technology and in doing so improve credibility and liquidity.

15.     Prior to the engagement of the investment banking firm of PPH&B, the Company's president and CEO made numerous contacts at various levels both within the energy oilfield service sector and through conventional financing institutions and private equity firms. While there was significant interest, the effort did not result in a tangible transaction that met the Company's objectives.  Until recently, PDTI Nev, with the assistance of PPH&B, continued these efforts and resulted the exchange of term sheets with interested parties and in once case a proposed joint working agreement with a major oilfield service provider.   However, the

withdrawal of the Company's senior secured credit facility and resultant liquidity crisis made entry in to the working agreement unfeasible.

16.     In total, the Debtors and PPH&B pursued various arraignments with 51 different companies.  The vast majority of these companies declined any interest and the balance went silent or did not return calls.

17.     On June 1, 2009, the Debtors filed a motion for Approval Of Debtor In Possession Financing Agreement And The Granting Of Post Petition Liens And Security Interests Under 11 U.S.C. §364 [Docket No. 7] (the "DIP Motion").

18.     On June 5, 2009, the Court entered interim order approving the DIP Motion and authorizing the Debtors to borrow $1,575,000 from Heil ("DIP Loan Facility").  A hearing on the entry of a final order on the DIP Motion is scheduled for June 24, 2009, at 4:00. p.m.  In conjunction with the sale of the Debtors assets to the Proposed Purchaser, Heil intends assign his interest in the DIP Loan Facility to the Proposed Purchaser, enabling the Proposed Purchaser to credit bid the amounts owing by the Debtor under the DIP Loan Facility as consideration for the sale.

19.     The case has been set on a fast track for confirmation, with the Court establishing abbreviated deadlines pertaining to the disclosure statement and confirmation filings. The Debtor must file a plan and disclosure statement with the Court no later than June 15, 2009, with a hearing to conditionally approve Debtors' disclosure statement set for June 24, 2009 and confirmation on July 29, 2009.  The Debtors intend to have the hearing on the sale of the Debtors assets as contemplated herein in conjunction with and at the same time as the confirmation hearing.

## **The Proposed Sale**

20.     As is more fully set forth in the Debtors' Motion For Order (A) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear Of Liens, Claims, Interests, Charges and Encumbrances; and (B) Authorizing Assumption and Assignment of Leases and Contracts Under Section 365 of the Bankruptcy Code in Connection with Such Sale (the "Sale Motion") filed concurrently herewith, the Debtors and the Proposed Purchaser have entered into an Asset Purchase Agreement, a copy of which is attached as Exhibit A to the Sale Motion (the "Asset Purchase Agreement") under which, subject to the Auction contemplated hereby and subject to Court approval, the Proposed Purchaser would purchase substantially all of the assets of the Debtors (collectively, the "Assets").

21.     The Debtors seek entry of an order substantially in the form of the proposed order attached hereto (the "Sales Procedures Order") setting the date of the Auction, scheduling a date, time and place for a hearing to approve the sale of the Assets (the "Sale Hearing"), and approving the proposed bidding procedures (the "Bidding Procedures") and certain notices and objection deadlines.   The proposed Sales Procedures Order specifies the procedures for objections to the proposed assumption and assignment of certain executory contracts, and approves the notice the Debtors intend to provide of the Auction, the sale of the Assets, and the intended assumption and assignment of executory contracts and unexpired leases.

22.     At the Auction, the Debtors propose to offer the Assets for sale.   At the conclusion of the Auction, the Debtors propose to identify the highest or otherwise best offer for the Assets (to the extent such offer is acceptable to Debtors, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") together with, if applicable, a second-highest bid. The Successful Bidder will be required to comply with the Court-approved bidding procedures and to commit to proceed to a closing on contractual terms at least as favorable to the Debtors as

those set forth in the Asset Purchase Agreement.  At the final hearing on the Sale Motion, the Debtors shall report the results of the Auction and seek approval of either the Asset Purchase Agreement with the Proposed Purchaser or the asset purchase agreement proposed by the Successful Bidder.

## The Bidding Procedures

23.     The consideration to be paid by the Proposed Purchaser for the Assets is the sum of (i) a credit bid of the outstanding principal and interest on the secured DIP Loan Facility, and (ii) $200,000 in cash (subject to adjustment as set forth in the Asset Purchase Agreement) (the "Offer"). The Debtors believe that the total value of the offer is approximately $1.3 million to $1.8 million (depending on the amount of funds advanced and outstanding under the DIP Loan Facility at closing).  While the Debtors believe that the Offer is fair and reasonable, the Debtors believe that the best interests of their estates are served by conducting a public Auction to identify the highest or otherwise best offer for the Assets.  Accordingly, in addition to seeking approval of the Asset Purchase Agreement with the Proposed Purchaser or the Successful Bidder via the Sale Motion, the Debtors seek the Court's approval of the following Bidding Procedures, which are attached hereto as Exhibit A[1] [2].  The Bidding Procedures provide an efficient, fair, and open framework for all interested Qualified Bidders to make proposals to enter into a transaction to acquire the Debtors' assets.

---

[1]     To the extent the description of the Bidding Procedures set forth herein differs from those set forth in Exhibit A hereto, the terms of Exhibit A shall control.

[2] Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Bidding Procedures.

24.     In summary, the Bidding Procedures, which are designed to attract higher and better offers for the Sale of the Assets, provide for the following process in connection with the sale of the Assets:[3]

A.     **Assets to be Sold.**  The Debtors are offering substantially all of their assets for sale.

B.     **The Bidding Process.**  The Debtors shall (i) determine whether any person is a Qualified Bidder (hereinafter defined), (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence investigations regarding the Debtors' businesses, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offer made to purchase the Assets, together or separately (collectively, the "Bidding Process").  Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Qualified Bidder. The Proposed Purchaser is deemed a Qualified Bidder.

C.     **Participation Requirements.**  Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

(i)     All Qualified Bids must be submitted to James B. Terry, 5611 Baird Court, Houston, TX 77041, with copies to (a) Edward L. Rothberg, Weycer, Kaplan, Pulaski & Zuber, P.C., 1400 Summit Tower, Eleven Greenway Plaza, Houston, Texas 77046, not later than 5:00 p.m. (CST) on July 23, 2009 (the "Bid Deadline").  Debtors shall immediately distribute by facsimile transmission, personal delivery or reliable overnight courier service a copy of each Bid upon receipt to (a) Ronald R. Peterson, Jenner & Block LLP, 330 N. Wabash Avenue, Chicago, IL 60611-7603, 312 840-7381 (fax);

(ii)     All Qualified Bids shall be in the form of a letter from a person or persons that the Chief Executive Officer deems financially able to consummate the purchase of the Assets, which letter states:

(a)     that such Qualified Bidder offers to purchase the Assets upon the terms and conditions set forth in a copy of Asset Purchase Agreement, together with its Exhibits and Schedules, executed by the Bidder and marked to show proposed amendments and modifications, including, but not limited to, price and the time of closing, and such modifications as are appropriate to reflect any modifications to the Assets proposed to be purchased (the "Marked Agreement");

---

[3] The Bidding Procedures are attached hereto as Exhibit A.  In the event of any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures shall govern.

(b)  that each such Qualified Bidder is prepared to execute a contract within one business day following designation of such Qualified Bidder as the winning Bidder and to consummate the transaction within ten days following entry of an order of the Court in substantially the form of the Order attached to the Sale Motion approving the sale to the Successful Bidder;

(c)  that each such Qualified Bidder's offer is irrevocable until the earlier to occur of:  (i) 30 days after the Sale Hearing or (ii) two (2) business days after the closing of a purchase of the Assets; and

(d)  the nature of any insider relationship between any Qualified Bidder and the Debtors, or any member of any Committee appointed in the Bankruptcy Cases;

(iii)  All Qualified Bids shall have a cash component of at least $1,450,000;

(iv)  All Qualified Bids (other than the Offer) shall be (i) in the opinion of the Debtors, not materially more burdensome or conditional than the terms of the Asset Purchase Agreement; and (ii) have a value greater than or equal to the sum of (a) the value of the Proposed Purchaser's offer plus (b) $75,000;

(vi)  All Bids shall obligate the Bidder, upon submission of its Marked Agreement, to deposit into escrow not less than the sum of $100,000 (the "Good Faith Deposit");

(vii)  All Bids shall be, in the opinion of Debtors, substantially on the same or better terms and conditions as set forth in the Asset Purchase Agreement;

(viii)  All Bids shall be accompanied by satisfactory evidence, in the opinion of the Debtors, of committed financing or other ability to perform;

(ix) All Bids shall contain no contingencies of any kind or character, including without limitation, contingencies relating to financing, validity, due diligence, or subsequent events other than approval of the Bid by this Court if the Bid is selected as the Successful Bid, except as provided in the Asset Purchase Agreement.

Bids not constituting Qualified Bids or that are otherwise defective cannot be remedied or otherwise resubmitted after the Bid Deadline.  Notwithstanding the preceding, the Proposed Purchaser is a Qualified Bidder.

D.  **Due Diligence.**  The Debtors shall afford each Qualified Bidder due diligence access to the Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, on site inspections and such other matters which a Qualified Bidder may request and which the Debtors, in their sole discretion, may agree to.  Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information

relating to the Assets to any person except to Qualified Bidders.  Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtors or its representatives.

E.    **Bid Protection.**  Recognizing the Proposed Purchaser's expenditure of time, energy and resources, the Debtors have agreed to provide, with Bankruptcy Court approval, certain bidding protections to the Proposed Purchaser specified in Section 6.7 of the Asset Purchase Agreement.  Specifically, the Debtors have determined that the Asset Purchase Agreement will further the goals of the Bidding Procedures by setting a floor which all other Bidders must exceed and, therefore, is entitled to be selected as a "Stalking Horse Bid."  As more fully described in Section 6.7 of the Asset Purchase Agreement, in the event that (i) the Asset Purchase Agreement is terminated by the Debtors when the Buyer is not in material breach thereof, or terminated by the Buyer as a result of the Debtors' acceptance of an Alternative Transaction (as defined in  the Asset Purchase Agreement), (ii) the Buyer has waived material contingencies as provided in Section 6.7 of the Asset Purchase Agreement, and if the Court approves a competing Qualified Bidder providing for the sale of the Assets other than the Proposed Purchaser, and if such sale to such Qualified Bidder closes and is consummated, then Debtors shall pay the Proposed Purchaser $75,000 (the "Break Up Fee").  The Break Up Fee shall be entitled to superpriority administrative claim status in the Debtors' bankruptcy case, senior to all other administrative claims.

F.    **"As Is, Where Is".**  The sale of any or all of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the applicable agreement of the Successful Bidder(s) as approved by the Court.  Except as otherwise provided in the applicable agreement, all of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, equitable servitudes, and interests thereon and there against (collectively, the "Interests") in accordance with section 363and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, in the applicable Marked Agreement.

G.    **Auction.**  If the Debtors receive a competing Qualified Bid, the Debtors shall conduct an auction (the "Auction") at the offices of Weycer Kaplan Pulaski & Zuber, 11 Greenway Plaza, Ste 1400, Houston, TX 77046, on July 27, 2009 beginning at 10:00 a.m. (CST) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  Only representatives of the Proposed Purchaser, the Debtors, the United States Trustee, any official committee appointed in the Debtors' bankruptcy cases, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction.  The Debtors may announce at the Auction additional rules for conducting the Auction, so long as such rules are not inconsistent with these Bidding Procedures.  Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in their sole discretion, may conduct the Auction in the manner they determine will achieve the maximum value for Assets.  Bidding will be conducted in increments of not less than $25,000.  The Proposed Purchaser shall be entitled to credit bid the amount of the outstanding secured DIP Loan Facility in connection with any bid it makes at the Auction.  Subject to higher and better bids received at the Auction, the Offer of the Proposed Purchaser is deemed acceptable to the Debtors.

The Debtors may adopt rules for bidding at the Auction that, in their business judgment, will better promote the goals of the bidding process and that are not inconsistent with any of the provisions of the Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

As soon as practicable after the conclusion of the Auction, the Debtors shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale and (ii) identify the highest or otherwise best offer for the Assets and any second-highest offer.  At the Sale Hearing, the Debtors may present to the Bankruptcy Court for approval the Successful Bid.  The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

H.    **Acceptance of Qualified Bids**.  The Debtors shall sell the Assets to the Proposed Purchaser or the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, upon approval of such Qualified Bid by the Bankruptcy Court at the Sale Hearing.  The Debtors' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

I.    **The Sale Hearing.**  The Sale Hearing is presently scheduled to take place at 1:30 p.m. on July 29, 2009.  At the Sale Hearing, the Debtors will seek entry of an order, among other things, authorizing and approving the sale to the Proposed Purchaser or the Successful Bidder, as the case may be, as determined by the

Debtors in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Asset Purchase Agreement or the Marked Agreement submitted by the Successful Bidder (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors).  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing.

J.     **Return of Good Faith Deposit.**  Good Faith Deposits of all Qualified Bidders shall be held in an interest bearing escrow account. Except for the Successor Bidder, the Debtors shall hold the Good Faith Deposits of all Qualified Bidders until the earlier of (a) two (2) business days after the closing of the sale by which all of the Assets that were the subject of such bid have been disposed of to one or more Qualified Bidders pursuant to these Bid Procedures, and 30 days after the conclusion of the Sale Hearing.  If a Successful Bidder successfully consummates an approved Transaction, such Successful Bidder's Good Faith Deposit shall be applied to the purchase price in such Transaction. If a Successful Bidder fails to consummate an approved Transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to (i) retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder, and (ii) seek all available damages from such Successful Bidder occurring as a result of such Successful Bidder's failure to perform.

K.     **Modifications.**  The Debtors may (i) determine, in their business judgment, which Qualified Bid(s), if any, is the highest or otherwise best offer, (ii) consult with the representatives of any committee formed in the Bankruptcy Case, or other significant constituents in connection with the Bidding Process, and (iii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that, in the Debtors' sole discretion, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (z) contrary to the best interests of the Debtors, their estates, their creditors and other parties in interest, provided the Debtors advise the Committee of such rejection.   At or before the Sale Hearing, the Bankruptcy Court, or, consistent with the purposes of the Bidding Procedures to obtain the highest or otherwise best offer(s) for the Assets, the Debtors, may impose such other terms and conditions as it or they may determine to be in the best interests of the Debtors' estates, their creditors and other parties in interest.

## Executory Contracts and Unexpired Leases to be Transferred

25.     The Assets to be sold to the Proposed Purchaser, or the Successful Bidder, following the Auction, may include certain executory contracts and unexpired leases which the Debtors intend to assume and assign to the Proposed Purchaser or the Successful Bidder

following the Auction, pursuant to section 365 of the Bankruptcy Code.  A Schedule of the executory contracts which Debtors currently intend to assume and assign to the Proposed Purchaser will be submitted as <u>Exhibit B</u> to the Sale Motion, filed contemporaneously herewith, prior to the hearing on this Motion.  Upon entry of the Sales Procedures Order, the Debtors will serve a copy of the Cure Notice, attached hereto as <u>Exhibit C</u> (the "<u>Cure Notice</u>") on all non-Debtor parties to the executory contracts and unexpired leases which Debtors currently intend to assume and assign to the Proposed Purchaser.

26.     The Cure Notice informs each such counterparty that the executory contracts and unexpired leases <u>may</u> be assumed by the Debtors and assigned to a prospective purchaser at the Sale Hearing.  The Cure Notice also identifies the amounts, if any, that the Debtors believe they owe to such contract or lease counterparty to cure defaults under each respective executory contract and unexpired lease (the "<u>Cure Amounts</u>").  The Cure Notice further provides that any objection must set forth all specific defaults in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice.

27.     In addition, the proposed Sales Procedures Order contemplates that in the event that between the time of the distribution of the Cure Notice and the Auction, the Debtors identify additional executory contracts or unexpired leases not set forth in the Cure Notice, the Debtors will send a supplemental Cure Notice (a "<u>Supplemental Cure Notice</u>") to the counterparties to such additional executory contracts or unexpired leases.

28.     If a non-debtor party to an executory contract or unexpired lease which Debtors intend to assume and assign to the Proposed Purchaser or the Successful Bidder files an objection to the proposed assumption and assignment or to the proposed Cure Amount identified

in the Cure Notice, the Court can determine the cure amount due, or otherwise resolve the objection, at the Sale Hearing.

29.     The Debtors have determined that the Bidding Procedures are in the best interests of the Debtors' estates and are designed to maximize the realizable value of the Assets for the benefit of the Debtors' estates, particularly in light of the Debtors' extensive efforts (both prepetition and postpetition) to negotiate a transaction with respect to the Assets.[4]

### Relief Requested

30.     By this Motion, the Debtors Sellers request that, pursuant to Bankruptcy Code §§ 105, 363, and 1146 and Rules 2002 and 6004 of the Bankruptcy Rules, the Court enter an Order (a) approving the Bidding Procedures in connection with the proposed sale (the "Sale"), by the Debtors to Proposed Purchaser or such other Successful Bidder of the Assets; (b) setting a date for an auction of the Assets (the "Auction"); (c) setting a date for the hearing on the Sale Motion (the "Sale Hearing"); (d) providing Proposed Purchaser with certain bidding protections; and (e) granting such other relief as is fair and equitable.

### The Bidding Procedures

31.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction. Sellers believe that good cause exists to expose the Assets to sale at auction. An auction conducted substantially in accordance with the Sale Procedures will enable Sellers to obtain the highest and best offers for the Assets, thereby maximizing the value of the estates.

32.     Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  *See*, *e.g.*,

---

[4] These efforts are described in greater detail in the Sale Motion.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y., 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

33.     The Bidding Procedures provide an appropriate framework for selling the Assets and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estate and creditors. Therefore, the Debtors respectfully request that this Court approve the Sale Procedures.

## Bidding Protections Are Fair And Reasonable

34.      The Debtors request that the Court approve certain bidding protections for Proposed Purchaser, including the Break-Up Fee and certain other protections.  The Debtors believe that Proposed Purchaser's participation as a "stalking horse bidder" is necessary to create competitive bidding and maximize the value of the Assets.  Specifically, the payment of the Break-Up Fee is both reasonable and necessary to induce Proposed Purchaser to enter into the transactions encompassed by the Proposed Purchaser Agreement and to obtain the highest price possible for the Assets.  The bidding protections provided for in the Bidding Procedures are customary in similar circumstances and were negotiated in good faith and at arms' length.

35.      Break-up fees serve a number of useful functions: (1) they attract bidders, (2) they help to insure that a bidder does not withdraw its bid, and (3) they help to establish a bid standard for other bidders. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 661-62 (S.D.N.Y. 1992); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1991) ("without such fees, bidders would

be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher

bid from another bidder who would capitalize on the initial bidder's ... due diligence").

36.     As a consequence, courts frequently approve break up fees in connection with

proposed bankruptcy sales.  Courts considering the propriety of a proposed breakup fee typically

consider "(1) whether the relationship of the parties who negotiated the fee is marked by self-

dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3)

whether the amount of the fee is reasonable in relation to the proposed purchase price."  *In re

Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord*, *In re Bidermann Indus.

U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources*, 147 B.R. at 657.

*See also In re Dexterity Surgical, Inc.* Case No. 04-35817 (Bankr. S.D. Tex. Dec. 30, 2005).

37.     In this case, the Break Up Fee will amount to approximately 3% to 5% of the

value of the Offer.  As such, the proposed fee is well within the range of fees typically paid in

other significant sales transactions that have been consummated in a bankruptcy setting.  *See*,

*e.g.*, *Consumer News & Business Channel Partnership v. Financial News Network, Inc., (In re

Financial News Network Inc.*), 980 F.2d 165, 167 (2d Cir. 1992) (noting that the transaction at

issue provided for a $8.2 million break-up fee on the $149.3 million transaction [over 5%]); *but

see Twenver*, 149 BR. at 957 (disapproving of a proposed break-up fee of ten percent of the total

purchase price).  *See also In re Rouge Indus., Inc.*, Case No. 03-13272 (Bankr. D. Del. Dec. 3,

2003) (approving break up fee of up to $4.5 million, or 3% of cash purchase price); *In re

AmeriServe Food Distrib., Inc.*, Case No. 00-00358 (Bankr. D. Del Jan. 1, 2000) (approving

break up fee of $4 million or 3.6% in connection with $110 million sale of assets); *In re Fruit of

the Loom, Inc.*, Case No. 99-4497   (Bankr. D. Del. Dec. 11, 2001) (approving $25 million

termination fee provision which was approximately 3.0% of transaction value) *In re Tiara

*Motorcoach Corp.*, 212 B.R. 133, 138 n.6 (Bankr. N.D. Ind. 1997); *In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992 (citing *Cottle v. Storer Communication*, 849 F.2d 570, 578-79 (11th Cir. 1988); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990); In *re 995 Fifth Avenue Assocs., L.P.*, 96 B.R. 28 (Bankr. S.D.N.Y. 1989).  In this case, the amount of the proposed Break-Up Fee is reasonable given the circumstances of the case and the size, speed and complexity of this transaction.

38.     As stated, the Asset Purchase Agreement is subject to higher and better offers received pursuant to the Bidding Procedures. If higher and better offers emerge, they will be considered with reference and by comparison to the terms of the Asset Purchase Agreement. The Debtors submit that good and sufficient cause exists to approve the proposed Bidding Procedures. The Debtors submit the Bidding Procedures are in the best interests of the Debtors, their estates, and creditors because they will enable the Debtors to realize the maximum value from the sale of the Debtors' Assets.

**Auction, Hearing and Notice**

39.     For the reasons described in this Motion, the Debtors wish to proceed to an Auction and hearing on final approval of the Sale Motion as expeditiously as applicable law and the Court's calendar will allow, but still will give the requisite notice of such sale.

*40.*     Immediately following entry of the Sales Procedures Order, the Debtor will distribute a Notice of Sale of Assets and Auction, a copy of which is attached hereto as <u>Exhibit B</u> (the "<u>Auction Notice</u>"), to: (a) Debtors' Full & Master Service Lists; and (i) all parties that the Debtors' investment bankers believe may constitute Qualified Bidders.  In addition, the Debtors will distribute the Cure Notice to all counterparties to executory contracts and unexpired leases proposed to be assumed and assigned.

41.     In addition, if required, the Debtors will publish an abbreviated version of the Auction Notice at least once in the [publication to be determined] at least ten (10) days prior to the Auction.  The Debtors contend that such notice of the Auction is good and sufficient notice and that no other or further notice is required.

## Notice

42.     The Debtors are providing notice of this Motion to: (a) the Office of the United States Trustee; (b) Debtors' Full & Master Service Lists.  In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

43.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Concluded on the following page.]*

**WHEREFORE**, the Debtors respectfully request that the Court (a) approve the Bidding Procedures attached hereto as Exhibit B; (b) set July 27, 2009 beginning at 10:00 a.m. (CST) as the date and time for the Auction; (c) set July 29, 2009 at 1:30 p.m. as the date and time for the Sale Hearing; (d) provide Buyer with bidder protections; and (e) grant such other relief, both at law and in equity to which they may be justly entitled.

Dated:  June 15, 2009

Respectfully submitted,

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By:    /s/ Melissa A. Haselden
      EDWARD L. ROTHBERG
      State Bar No. 17313990
      MELISSA A. HASELSEN
      State Bar No. 00794778
      1400 Summit Tower
      Eleven Greenway Plaza
      Houston, Texas 77046
      Telephone:  (713) 961-9045
      Facsimile:  (713) 961-5341

      PROPOSED ATTORNEY FOR DEBTORS